ACCEPTED
15-24-00133-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
3/7/2025 4:28 PM
CHRISTOPHER A. PRINE
CLERK

**No. 15-24-00133-CV**

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
3/7/2025 4:28:43 PM
CHRISTOPHER A. PRINE
Clerk

# In the
# Fifteenth Court of Appeals
## Austin, Texas

Insight Investments, LLC
*Appellant*

v.

Stonebriar Commercial Finance, LLC
*Appellee*

On appeal
From the 380th Judicial District Court, Collin County, Texas
Cause No. 380-06242-2022

## Appellant's Brief

Thomas C. Wright
Rachel H. Stinson
Kyle C. Steingreaber
**WRIGHT CLOSE & BARGER, LLP**
One Riverway, Suite 2200
Houston, Texas 77056
(713) 572-4321 (Phone)
(713) 572-4320 (Facsimile)

**Oral Argument Requested**

*Counsel for Appellant*
*Insight Investments, LLC*

## IDENTITY OF PARTIES AND COUNSEL

| | |
|---|---|
| **Plaintiff/Appellee** | Stonebriar Commercial Finance, LLC |
| *Trial & Appellate Counsel* | LeElle B. Slifer<br>State Bar No. 24074549<br>Dylan French<br>State Bar No. 24116393<br>**WINSTON & STRAWN LLP**<br>2121 North Pearl St., Ste 900<br>Dallas, Texas 75202<br>Telephone: (214) 453-6500<br>Facsimile: (214) 453-6400<br>lslifer@winston.com<br>dfrench@winston.com |
| **Defendant/Appellant** | Insight Investments, LLC |
| *Trial Counsel* | Mark W. Stout<br>State Bar No. 24008096<br>mstout@padfieldstout.com<br>Jeffrey V. Leaverton<br>State Bar No. 24078840<br>jleaverton@padfieldstout.com<br>Owen C. Babcock<br>State Bar No. 24104585<br>obabcock@padfieldstout.com<br>**PADFIELD & STOUT, L.L.P.**<br>100 Throckmorton Street, Suite 700<br>Fort Worth, Texas 76102<br>(817) 338-1616 – Telephone<br>(817) 338-1610 – Facsimile |
| *Appellate Counsel* | Thomas C. Wright<br>State Bar No. 22059400<br>Rachel H. Stinson<br>State Bar No. 24037347<br>Kyle C. Steingreaber<br>State Bar No. 24110406 |

ii

**WRIGHT CLOSE & BARGER, LLP**
One Riverway, Suite 2200
Houston, Texas 77056
(713) 572-4321 - Telephone
(713) 572-4320 - Facsimile
wright@wrightclosebarger.com
stinson@wrightclosebarger.com
steingreaber@wrightclosebarger.com

iii

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL..............................................ii

INDEX OF AUTHORITIES ...........................................................vi

STATEMENT OF THE CASE ........................................................ix

REQUEST FOR ORAL ARGUMENT...................................................x

ISSUES PRESENTED ..............................................................xi

STATEMENT OF FACTS ............................................................1

SUMMARY OF THE ARGUMENT .......................................................11

ARGUMENT .....................................................................12

I.    Stonebriar did not conclusively prove any element of its
      breach-of-contract claim or its entitlement to specific
      performance...............................................................12

      A. The July 27 specification's integration clause and the
         parol evidence rule bar enforcement of the July 25
         letter. ...............................................................13

      B.   Further, Stonebriar did not conclusively prove its
           entitlement to specific performance. ..................................19

           1.   Insight only agreed to indemnify Stonebriar;
                Stonebriar admits, though, that delayed receipt of
                the landlord waiver caused Stonebriar no harm or
                damage. ........................................................20

           2.   Insight delivered the landlord waiver within the
                reasonable time Texas law afforded it, so it did not
                violate the July 25 letter........................................22

           3.   Stonebriar did not show that it lacks a remedy at
                law. ..........................................................25

      C.   Stonebriar did not conclusively prove that it can
           convey the lease to Insight..........................................26

II.     Because the judgment purports to require Insight to repurchase the lease pursuant to an extrinsic promissory note, and because the lease at issue had previously been rejected by a bankruptcy court, the judgment is unenforceable, unduly vague, and indefinte. ...............................27

III.   Insufficient evidence supports the trial court's award of attorneys' fees to Stonebriar. .......................................34

PRAYER .................................................................................38

CERTIFICATES.......................................................................40

# INDEX OF AUTHORITIES

**Cases**

*Baroid Equip., Inc. v. Odeco Drilling, Inc.,*
 184 S.W.3d 1 (Tex. App.—Houston [1st Dist.] 2005,
 pet. denied)................................................................................14

*Bd. of Regents of Univ. of Texas Sys. v. IDEXX Labs.,*
 691 S.W.3d 438 (Tex. 2024) ...................................................20

*Brook Mays Organ Co., Inc. v. Sondock,*
 551 S.W.2d 160 (Tex. App. 1977, writ ref'd n.r.e.) .............29

*Christus Health Se. Tex. v. Hall,*
 No. 09-07-074-CV, 2008 WL 2759785
 (Tex. App.—Beaumont July 17, 2008, no pet.) (mem. op.) ...............35

*CHSPSC v. Hansen,*
 525 S.W.3d 671 (Tex. 2017) ...................................................21

*Criswell v. European Crossroads Shopping Ctr., Ltd.,*
 792 S.W.2d 945 (Tex. 1990) ...................................................21

*DeClaire v. G & B McIntosh Fam. Ltd. P'ship,*
 260 S.W.3d 34 (Tex. App.—Houston [1st Dist.] 2008, no pet.) ..... 17, 18

*Digiuseppe v. Lawler,*
 269 S.W.3d 588 (Tex. 2008) ...................................................26

*Dresser Indus., Inc. v. Page Petroleum, Inc.,*
 853 S.W.2d 505 (Tex. 1993) .............................................20, 22

*Edascio, L.L.C. v. NextiraOne L.L.C.,*
 264 S.W.3d 786 (Tex. App.—Houston [1st Dist.] 2008,
 pet. denied)..................................................................... 14, 17, 18

*Fein v. R.P.H., Inc.,*
 68 S.W.3d 260 (Tex. App.—Houston [14th Dist.] 2002,
 pet. denied)................................................................................16

*FPL Energy, LLC v. TXU Portfolio Mgmt. Co., L.P.,*
 426 S.W.3d 59 (Tex. 2014) .....................................................19

*Great Hans, LLC v. Liberty Bankers Life Ins. Co.,*
 No. 05-17-01144-CV, 2019 WL 1219110 (Tex. App.—Dallas
 Mar. 15, 2019, no pet.) (mem. op.)........................................33

*Howell v. Mauzy,*
 774 S.W.2d 274 (Tex. App.—Austin [3rd Dist.] 1989,
 writ denied) .................................................................................. 31

*In re 24R, Inc.,*
 324 S.W.3d 564 (Tex. 2010) (per curiam) (orig. proceeding) ............... 14

*Int'l Sec. Life Ins. Co. v. Spray,*
 468 S.W.2d 347 (Tex. 1971) ...................................................... 30

*Intercontinental Grp. P'ship v. KB Home Lone Star L.P.,*
 295 S.W.3d 650 (Tex. 2009) ...................................................... 34

*Maxey v. Maxey,*
 617 S.W.3d 207 (Tex. App.—Houston [1st Dist.] 2020, no pet.) ......... 13

*Nat'l Prop. Holdings, L.P. v. Westergreen,*
 453 S.W.3d 419 (Tex. 2015) ...................................................... 19

*Phillips v. Phillips,*
 820 S.W.2d 785 (Tex. 1991) ...................................................... 22

*Rausheck v. Empire Life Ins. Co. of Am.,*
 507 S.W.2d 337 (Tex. App.—Texarkana 1974, writ ref'd n.r.e.) ......... 29

*Reilly v. Rangers Mgmt., Inc.,*
 727 S.W.2d 527 (Tex. 1987) ...................................................... 21

*Rhone-Poulenc, Inc. v. Steel,*
 997 S.W.2d 217 (Tex. 1999) ...................................................... 13

*Riner v. Neumann,*
 No. 05-07-01053-CV, 2008 WL 4938438
 (Tex. App.—Dallas Nov. 20, 2008, no pet.) (mem. op.) ...................... 31

*Rockmore v. Davenport,*
 14 Tex. 602 (1855) ................................................................... 11

*Rohrmoos Venture v. UTSW DVA Healthcare, LLP,*
 578 S.W.3d 469 (Tex. 2019) .................................................. 34, 35

*Salomon v. Lesay,*
 369 S.W.3d 540 (Tex. App.—Houston [1st Dist.] 2012, no pet.) ......... 33

*Scripps NP Operating, LLC v. Carter,*
 573 S.W.3d 781 (Tex. 2019) .................................................. 12, 13

*Sharyland Water Supply Corp. v. City of Alton,*
 354 S.W.3d 407 (Tex. 2011) ...................................................... 25

*Spiva v. Williams,*
20 Tex. 442 (1857) ..................................................................29

*Stafford v. S. Vanity Magazine, Inc.,*
231 S.W.3d 530 (Tex. App.—Dallas 2007, pet. denied).......................30

*Sw. Sunrise, LLC v. John Gannon, Inc.,*
No. 14-22-00551-CV, 2024 WL 1793021
(Tex. App.—Houston [14th Dist.] Apr. 25, 2024, no pet.)
(mem. op.)................................................................................26

*Tri-Steel Structures, Inc. v. Baptist Found. of Tex.,*
166 S.W.3d 443 (Tex. App.—Fort Worth 2005, pet. denied)...............18

*Waak v. Rodriguez,*
603 S.W.3d 103 (Tex. 2020) ....................................................35

*Wade Contractors, Inc. v. C.W.&A., Inc.,*
589 S.W.2d 505 (Tex. App.—Corpus Christi 1979,
writ ref'd n.r.e.) ...............................................................22, 23

*Wallerstein v. Spirt,*
8 S.W.3d 774 (Tex. App.—Austin 1999, no pet.) ................................20

## Other Authorities

*Collect*, American Heritage Dictionary, *available at* American
Heritage Dictionary Entry: COLLECT ............................................35

## Rules

Tex. R. Civ. P. 166a ..............................................................13

Tex. R. Civ. P. 301 ...............................................................29

# STATEMENT OF THE CASE

| | |
|---|---|
| **Nature of the Case** | Commercial dispute over the terms of a non-recourse loan connected to a multi-million-dollar equipment lease. Stonebriar Commercial Finance, LLC ("Stonebriar") sued Insight Investments, LLC for alleged breach of a parol letter, pleading for only "equitable" and "nonmonetary relief."[1] |
| **Course of Proceedings** | The trial court granted summary judgment for Stonebriar on its breach-of-contract claim.[2] It then decided Stonebriar's entitlement to attorneys' fees via submission.[3] |
| **Disposition** | The trial court's judgment awards Stonebriar specific performance, $291,341 in attorneys' fees incurred, and additional, conditional appellate attorneys' fees.[4] Insight moved for a new trial and to vacate, modify, or reform the judgment,[5] but these motions were overruled by operation of law. Insight timely filed this appeal.[6]<br><br>After Insight filed its notice of appeal, Stonebriar asked the trial court to order Insight to post a supersedeas bond for $5,903,679.08 — a figure notably absent from either the pleadings or the judgment — and the trial court did so.[7] |

---

[1] CR14–22, Original Petition (Nov. 15, 2022).

[2] CR820–22, Order for Summary Judgment (May 3, 2024), attached as App'x 2.

[3] *See, e.g.*, CR820, Order for Summary Judgment.

[4] CR1021–23, Final Judgment (Sept. 16, 2024), attached as App'x 1.

[5] CR1029–58, Insight's *Motion to Reconsider, Set Aside, Reform, or Vacate Judgment and Motion for New Trial* (Oct. 16, 2024).

[6] CR1066–75, Insight's *Notice of Appeal to the Fifteenth Court of Appeals* (Dec. 10, 2024).

[7] Supp. CR11–37, Briefing and Order regarding Supersedeas Amount. Insight has asked this Court to review the trial court's supersedeas order, and this Court temporarily stayed that order.

## REQUEST FOR ORAL ARGUMENT

The judgment below is rife with error, any one of which necessitates a reversal. But since some of the issues, if addressed by the Court, would expedite rendition of a proper judgment below, Insight requests oral argument to explore with the Court which basis or bases for decision will work most efficiently not only for this case, but for the developing jurisprudence of this new and important Court. *See generally* Tex. R. App. P. 38.1(e).

# ISSUES PRESENTED

I.    A summary judgment for specific performance requires a plaintiff to demonstrate the absence of any fact issue, entitlement to judgment as a matter of law, and a lack of an adequate legal remedy for a breach of contract. Stonebriar sued Insight for specific performance of a letter regarding indemnification of Stonebriar for what it considered untimely delivery of a document, a letter that contradicts the parties' later, fully integrated contract. But Stonebriar admits it suffered no harm because of that delayed delivery. Did the trial court err in granting Stonebriar's motion for summary judgment?

II.    The judgment purports to require Insight to repurchase a lease by reference to a purported agreement that in turn refers to a promissory note instead of setting out an ascertainable amount of money in the judgment. Is the judgment erroneous, unenforceable, and impossible to perform because:

      a.    judgments are not supposed to require reference to extrinsic documents to determine the performance required under the judgment;

      b.    the lease agreement referred to in the document mentioned in the judgment was rejected through a bankruptcy proceeding before the judgment was signed, so that Stonebriar cannot convey any rights in the lease in exchange for Insight's payment to "repurchase" the lease; or

      c.    the letter referred to in the judgment in turn refers to a promissory note, but there is no signed promissory note in the summary judgment record?

III.    A plaintiff who seeks attorneys' fees under a contract must prove both that the contract authorizes fee-shifting and that the fees it seeks are reasonable and necessary. Stonebriar sought fees under the letter, which fee-shifts only "collection costs." While the case was, in Stonebriar's view, a simple one with few disputed facts, it claims to have incurred $291,341 in fees and costs, which Insight

objected to as including  duplicative work and inflated hours at unreasonable rates. Did the trial court err in awarding Stonebriar $291,341 in past attorneys' fees and $344,000 in conditional appellate fees and costs?

# STATEMENT OF FACTS

Insight leases audiovisual and other equipment to end-user customers.[8] Because acquiring that equipment can be capital intensive, Insight partners with sophisticated lenders like Stonebriar: Stonebriar lends the funds to Insight to buy the equipment, Insight coordinates the lease of the equipment to the end customer, and Stonebriar benefits through a security interest in the equipment and monthly lease payments from the customer.[9]

## Stonebriar and Insight sign a fully integrated master agreement to govern their future transactions.

To streamline their own transactions, Insight and Stonebriar agreed in April 2022 to pre-negotiated, comprehensive terms and conditions to incorporate into future contracts: the *Master Non-Recourse Security Agreement and Assignment*.[10] We call it "the master agreement."

The master agreement "set[] forth the terms and conditions pursuant to which" Insight and Stonebriar "may, from time to time, enter into specifications" — future contracts — that "incorporate" the master

---

[8] CR380, Czaja Declaration.
[9] CR380, Czaja Declaration.
[10] CR379–380, Czaja Declaration; CR248–64, *Master Non-Recourse Security Agreement and Assignment*, art. I (April 11, 2022), attached as <u>App'x 3</u>.

agreement, using a form contract based on a template attached to the master agreement.[11] Each form-contract specification, however, would "constitute[] a separate and independent agreement between the parties."[12]

Several of the master agreement's terms matter in this case. Per section 14 and 15 of article III, Insight — "Debtor" in the master agreement — agreed that it would "not cause or permit" Stonebriar's collateral "to be sold, transferred, assigned, encumbered . . . or disposed of" without consulting Stonebriar, and Insight would "promptly pay" Stonebriar any costs it incurred protecting its security interest.[13]

Under article III, section 25, Insight promised to "promptly" notify Stonebriar of "any event which would have a material adverse effect" on Stonebriar's security interests in the equipment, including providing notice of "any lien, security interest, encumbrance, or claim may be or asserted against" the equipment.[14]

---

[11] CR248, Master Agreement, art. I.
[12] CR248, Master Agreement, art. I.
[13] CR251, Master Agreement, art. III, §§ 14–15.
[14] CR248, Master Agreement, art. III, § 25.

The master agreement also defined the parties' rights and responsibilities in the event of a default. Article V, section 3 puts Insight in default if it "shall default in the due observance or performance of any term, covenant, or representation contained in this Agreement, or in any other document made and delivered by" Insight to Stonebriar, but only if the default is not cured "within fifteen days" after Stonebriar "has given notice of such default" to Insight.[15] And while the parties contemplated Stonebriar might sue Insight if a such an uncured default occurred, section 1.b of article VI limits Insight's potential responsibility for the note's balance: Insight "shall not be liable on a recourse basis for the payment of the principal and interest due under" the note.[16]

The form-contract specifications contemplated that several documents would become part of each contract (in addition to the terms of the master agreement itself), including a landlord waiver:

---

[15] CR254, Master Agreement, art. IV, § 2; CR249, Master Agreement, art. II, § 5.
[16] CR256, Master Agreement, art. VI, § 1.b.

1. [Master Lease Agreement] dated _____ between Customer and _____.
2. [Schedule No. ___] to [Master Lease Agreement]
3. [Certificate of Acceptance] dated _____, 20__
4. [Notice of Assignment] dated _____, 20__
5. [Landlord Waiver] dated _____, 20__
6. Certificate of Insurance dated _____, 20__
7. Guaranty from [_____] dated _____, 20__
8. [Identify other Contract Documents]

### *Insight agrees to indemnify Stonebriar if it cannot deliver a landlord waiver for an anticipated loan.*

In the leadup to a loan in the summer of 2022, Insight and Stonebriar recognized that Insight was having trouble obtaining a copy of the landlord waiver that the form specification contemplated.[17] In essence, that waiver — executed by the landlord for the ultimate lessee of the equipment — released any lien or claim that the landlord might make against the equipment securing Stonebriar's loan.[18]

So on July 25, 2022, Insight signed a letter to indemnify Stonebriar if Insight were unable to provide the Landlord Waiver:

> Insight Investments, LLC ("Insight") ***indemnifies and holds Stonebriar Commercial Finance LLC harmless*** from Insight's inability to provide Stonebriar Commercial Finance LLC with the

---

[17] *See, e.g.*, CR381, Czaja Declaration.
[18] CR402, Landlord Waiver (Nov. 15, 2022), attached as <u>App'x 5</u>.

4

> ***Landlord Waiver*** for the above-referenced transaction.
>
> The consideration for this ***indemnification*** is the loan that Stonebriar Commercial Finance LLC will make to Insight evidenced by a Promissory Note dated July 27, 2022. This Promissory Note is secured by the collateral described in the Security Agreement dated July 27, 2022.
>
> If the original documentation is not delivered to Stonebriar Commercial Finance LLC's office, then Insight, at Stonebriar Commercial Finance LLC's sole discretion, shall repurchase the Equipment Lease Agreement for the principal outstanding of the Promissory Note, plus accrued interest at the rate stated in the Promissory Note, plus all costs of collection including attorney's fees.[19]

Insight did so to protect Stonebriar in the event that the lessees' landlord claimed a superior interest in the equipment before executing the waiver (which the landlord never did).[20]

### Stonebriar and Insight complete the loan, creating a new, integrated contract.

Two days later, on July 27, 2022, Stonebriar and Insight signed an agreement entitled "Specification" that called for funding of a little more than $5 million to buy equipment to lease to Legacy Sports USA and

---

[19] CR72, Indemnification Letter (July 25, 2022), attached as App'x 6 (emphasis added).
[20] CR380, Czaja Declaration.

Legacy Cares ("Legacy").[21] Insight had leased equipment to Legacy at various times going back to 2021.[22]

As the master agreement contemplated, the July 27 specification "incorporated . . . by reference" the terms of the master agreement.[23] And it had no other "[a]dditional [t]erms" beyond those in or incorporated into the specification itself — things like the loan amount ($5,010,998), the funding date (July 27, 2022), and contract commencement date (July 1, 2022), and the initial contract term (48 months).[24] It does not incorporate, mention, or even hint at the existence of the July 25 letter. Instead, it says in paragraph 16 "Additional Terms: NONE."[25]

One of the provisions of the incorporated master agreement is this one in article VIII, section 5:

> This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and shall not be amended or altered in any manner except by a document in writing executed by both parties.[26]

---

[21] CR59, 266, Specification (July 27, 2022), attached as App'x 4.
[22] CR267, Schedule A to Specification No. 1 (referring to "Master Lease Agreement No. 9586 dated September 13, 2021").
[23] CR266, July 27 Specification.
[24] CR266, July 27 Specification.
[25] CR266, July 27 Specification.
[26] CR258, Master Agreement, art. VIII, § 5.

6

The specification was signed by both parties.[27] The indemnification letter was not.[28]

Months passed. Stonebriar received and accepted payments due to it under the lease,[29] and, to Insight and Stonebriar's knowledge, Legacy's landlord never claimed an interest in the leased equipment superior to Stonebriar's own.[30]

### Stonebriar demands that Insight buy back the lease.

On October 14, 2022, Stonebriar demanded out of the blue that Insight buy back the lease.[31] Stonebriar claimed that, because Insight had not yet been able to deliver the landlord waiver, the July 25 indemnification letter actually entitled Stonebriar to on-demand repayment of the multi-million-dollar note balance, plus interest.[32] Stonebriar sent a follow-up demand on November 2, 2022, increasing the claimed buy-back amount.[33]

---

[27] CR259, Master Agreement.
[28] CR72, Indemnification Letter.
[29] CR383, Czaja Declaration.
[30] CR381, Czaja Declaration; CR454, Stonebriar's Answer to Interrogatory 5.
[31] CR382, Czaja Declaration.
[32] *See* CR382 Czaja Declaration.
[33] CR382, Czaja Declaration.

Insight got the landlord waiver on November 15, 2022, and sent it to Stonebriar. Legacy's landlord "waive[d] and relinquishe[d] . . . any and all liens, security interests, rights, claims and demands of every kind" that it might have against the leased equipment.[34]

### Stonebriar sues for specific performance of the July 25 letter.

Stonebriar sued Insight on November 15, 2022 for breach of contract. According to Stonebriar, because Insight did not deliver the landlord waiver when Stonebriar decided it should, the July 25 letter entitled Stonebriar to force Insight to buy back the equipment lease for the outstanding balance of the note.[35] Stonebriar sought only specific performance — it did not plead for breach-of-contract damages (it suffered none[36]) and did not allege that its legal remedies were inadequate.[37] Nor did Stonebriar plead that it was ready, willing, and able to deliver the lease should Insight tender payment.[38] Stonebriar did, however, seek attorneys' fees under the July 25 letter.[39]

---

[34] CR402, Landlord Waiver; *see also* CR382–83, Czaja Declaration.
[35] *See* CR14–22, Original Petition.
[36] CR306–07, Stonebriar's Response to Interrogatory 8.
[37] *See* CR14–22, Original Petition.
[38] *See* CR14–22, Original Petition.
[39] *See* CR14–22, Original Petition.

8

***A lessee goes bankrupt, rejects its lease with Insight, and sells the equipment.***

Legacy Cares, one of the two lessees, declared bankruptcy in May 2023.[40] The bankruptcy court issued a sale order in November 2023, explaining that the lease between Legacy and Insight was "not, and may not be designated in the future to be," a contract assumed by Legacy Cares in the bankruptcy.[41] If the equipment were sold, then, effective upon closing, the Legacy-Insight lease "shall be deemed rejected pursuant to section 365(a) of the Bankruptcy Code."[42] Legacy Cares ultimately transferred all of the leased equipment to a third party through the bankruptcy, and Stonebriar continues to receive payments for the equipment under the financing arrangement utilized to consummate such transfer.[43]

***The trial court signs summary judgment for Stonebriar.***

Stonebriar ultimately moved for summary judgment on its breach-of-contract claim.[44] It neither argued nor offered evidence that its legal

---

[40] CR462, Bankruptcy Petition.
[41] CR711, Bankruptcy Sale Authorization (Nov. 22, 2023).
[42] CR711, Bankruptcy Sale Authorization.
[43] CR379–84, Czaja Declaration; CR418, May 31, 2023 Letter; CR419–20, November 9, 2023 Letter; CR710–11, Bankruptcy Sale Authorization.
[44] Stonebriar initially moved for summary judgment a few weeks after Insight first answered in the fall of 2022, but the trial court continued that initial setting.

remedies were inadequate to cure any breach of the July 25 letter, nor did it allege or plead that it was ready, willing, and able to deliver the lease to Insight. Stonebriar also offered no evidence of the note's outstanding balance. Insight responded, objecting to much of Stonebriar's evidence — including to the July 25 letter itself as improper parol evidence.[45] The trial court overruled Insight's evidentiary objections and granted Stonebriar's motion on the liability issue and later summarily decided the attorneys' fee issue by submission.[46]

On September 16, 2024, the trial court signed its judgment. It awarded Stonebriar $291,341 in past attorneys' fees and costs, more than $300,000 in conditional appellate attorneys' fees, and ordered Insight to "repurchase" the Legacy lease as follows:

> Insight is therefore ORDERED to repurchase the Equipment Lease Agreement pursuant to the terms of the Repurchase Letter within seven business days of this Final Judgment.[47]

The judgment does not specify the amount that Insight must pay to accomplish that buy-back directive.

---

[45] CR738–48, Insight's *Objections to Stonebriar Commercial Finance, LLC's Traditional Motion for Summary Judgment* (Apr. 26, 2024).
[46] CR820–22, Order for Summary Judgment.
[47] CR1021, Final Judgment.

Insight timely appealed, invoking this Court's jurisdiction. *See* Tex. Gov't Code § 22.201(p), § 22.220(a).

## SUMMARY OF THE ARGUMENT

Unhappy parties cannot avoid the clear terms of their comprehensive written contracts by resort to earlier, inconsistent promises. That rule is not a new or novel one — the parol evidence rule has "operate[d] to the exclusion of" inconsistent "prior of contemporaneous agreement[s]" in Texas for nearly two hundred years. *See Rockmore v. Davenport*, 14 Tex. 602, 604 (1855). Indeed, it bolsters a vital societal interest: securing the certainties, predictabilities, and expectations that flow from enforcing clear contracts according to their terms, the best evidence of the parties' intent. The judgment here shreds those principles.

The July 27 specification defines Stonebriar's rights and Insight's responsibilities for any breach by Insight, excluding any ability by Stonebriar to hold Insight "liable on a recourse basis" for the note's balance. Still, the trial court granted summary judgment on Stonebriar's claim for specific performance of the July 25 letter, which, according to Stonebriar, required Insight to — on demand from Stonebriar —

11

personally pay the note's balance. And despite the July 25 letter providing only "indemnification[,]" the trial court's judgment allows Stonebriar to unwind its loan without the required showing that it suffered any harm from delayed delivery of the landlord letter.

Aside from failing to prove a breach of the July 25 letter, no evidence justifies the specific-performance remedy the trial court awarded. Since, in the course of its bankruptcy, Legacy Cares sold all of the leased equipment and a new financing arrangement was negotiated, the lease Insight must buy back no longer exists — Stonebriar thus cannot prove an ability to perform its own obligations under the July 25 letter. Nor did Stonebriar conclusively prove that money damages are inadequate to compensate it for any breaches of the July 25 letter, leaving open the adequate legal remedy that forecloses equitable relief.

## ARGUMENT

### I. Stonebriar did not conclusively prove any element of its breach-of-contract claim or its entitlement to specific performance.

The familiar summary judgment framework governs this Court's de novo review of the Court's judgment. *Scripps NP Operating, LLC v. Carter,* 573 S.W.3d 781, 790 (Tex. 2019). Summary judgment is appropriate only when the movant proves, by competent evidence, that

12

no genuine issue of material fact exists such that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). In answering that ultimate question, this Court must — as the trial court should have — credit as true all evidence favoring Insight, while indulging "[e]very reasonable inference" and resolving "any doubts" in Insight's favor. *Carter*, 573 S.W.3d at 790. Ultimately, then, "[o]n appeal," Stonebriar "still bears the burden of showing that there is no genuine issue of material fact" and that the trial court properly granted summary judgment. *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999). Stonebriar cannot carry that burden.

## A. The July 27 specification's integration clause and the parol evidence rule bar enforcement of the July 25 letter.

Specific performance requires an underlying breach of contract. *Maxey v. Maxey*, 617 S.W.3d 207, 226 (Tex. App.—Houston [1st Dist.] 2020, no pet.). But the contract Stonebriar tries to enforce here — the July 25 letter — did not survive the July 27 specification.

A written agreement "presumes that all prior agreements relating to the transaction have been merged into it[,]" so it "cannot be added to, varied, or contradicted" with parol evidence of an "earlier, inconsistent

13

agreement." *Baroid Equip., Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1, 13 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). That rule "particularly" applies when the contract recites that it "contains the entire agreement between the parties." *Id.* So "[w]hen the parties have concluded a valid, integrated agreement, the parol evidence rule precludes enforcement of" any earlier, inconsistent agreements. *Edascio, L.L.C. v. NextiraOne L.L.C.*, 264 S.W.3d 786, 796 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). Such is our case, where the July 25 letter materially changes the terms of the fully integrated July 27 specification.

To begin, the July 27 specification incorporated all of the master agreement's terms into a new contract effective on July 27. "Documents incorporated into a contract by reference become part of that contract." *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010) (per curiam) (orig. proceeding). Insight and Stonebriar executed the specification "pursuant to" the master agreement, and "incorporated" its terms into the specification "by reference."[48] As the master agreement explains, the specification — though it incorporated the master agreement's terms —

---

[48] CR266, July 27 Specification.

14

"constitute[d] a separate and independent agreement between the parties."[49]

Stonebriar recognized that the remedies incorporated into the July 27 specification were its only ones for a potential breach by Insight. From article VIII, section 5 of the master agreement:

> This Agreement constitutes the entire agreement between the parties with respect to ***the subject matter hereof*** and shall not be amended or altered in any manner except by a document in writing executed by both parties.[50]

The July 27 specification, through the master agreement, addressed both the effect of Insight's potential failure to provide required documentation and Stonebriar's potential remedies. An "event of default" occurs under article V, section 2 if Insight "default[s] in the due observance or performance of any term, covenant or representation" in the agreement and does not cure it within a certain time.[51] Then, Stonebriar could, via article VI, section 1.b, sue Insight "for the collection of all amounts due under the Note[,]" "provided that" Insight "shall not

---

[49] CR248, Master Agreement, art. I.
[50] CR258, Master Agreement, art. VIII, § 5.
[51] CR254, Master Agreement, art. V, § 2.

be liable on a recourse basis for the payment of the principal and interest due under the Note."[52]

In shielding Insight from liability "on a recourse basis[,]" Stonebriar agreed to forfeit any ability to recover from Insight personally. "[U]nder a nonrecourse note, the maker does not personally guarantee repayment of the note and will, thus, have no personal liability." *Fein v. R.P.H., Inc.*, 68 S.W.3d 260, 266 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). By excluding Insight from recourse liability, Stonebriar made the note only "payable out of . . . the proceeds of the sale of the collateral securing the note[,]" *id.,* rather than directly from Insight's pocket.

Yet the trial court enforced what Stonebriar admits was an earlier, inconsistent letter and changed that tailored scheme. Whether an indemnity agreement or not, the July 25 letter purports to make Insight responsible for "the principal outstanding of the Promissory Note, plus accrued interest stated in the Promissory Note[.]"[53] Those terms fundamentally conflict with the master agreement's instruction that, in the event of a breach, Insight "is not liable for the payment of the

---

[52] CR256, Master Agreement, art. VI, § 1(b).
[53] CR269, July 25 Letter.

16

principal and interest due under the Note." And the July 25 letter is *not* signed by both parties as the integration clause requires.

*DeClaire* addressed a similar situation. The parties there agreed in writing that certain stock would "solely secure[]" a note's repayment, but the lender tried to hold the borrower personally liable based on an earlier, oral agreement obligating the borrower personally to repay the note. *DeClaire v. G & B McIntosh Fam. Ltd. P'ship*, 260 S.W.3d 34, 43, 46 (Tex. App.—Houston [1st Dist.] 2008, no pet.). The court of appeals had no trouble applying the parol evidence rule to the earlier agreement. "The parties' written contract[,]" the court explained, "included the same terms as the oral agreement, with the addition of the sole recourse language." *Id.* The trial court thus could not enforce the earlier, personal guarantee. *Id.*

*Edascio, L.L.C.* involved similar facts. That written contract between a company and its sales contractor entitled the contractor to commissions made on sales to customers specifically identified in a contractual schedule (ultimately, about 20,000 accounts). *Edascio, L.L.C.*, 264 S.W.3d at 797. But, according to the contractor, the company previously agreed that the contractor would receive an entire class of

17

commissionable customers (about 45,000 accounts). *Id.* at 798–99. Recognizing that parol evidence cannot "add[], var[y], or contradict[]" a later written contract, *id.* at 796, the court of appeals held that the first-in-time oral agreement was no evidence of a contract at all.

Those cases stand for the unremarkable proposition that "[e]vidence that violates the parol evidence rule has no legal effect and merely constitutes proof of facts that are immaterial and inoperative." *DeClaire*, 260 S.W.3d at 45. The July 25 letter conflicts with the later, integrated July 27 specification on the extent and type of liability Insight might incur for non-delivery of certain contract documents. The July 25 letter thus has no legal effect.

Only that result recognizes the parties' intent in explicitly integrating the July 27 specification. The entire "purpose of an integration clause is to trigger the parol evidence rule[,]" preventing future enforcement of past, inconsistent agreements. *Tri-Steel Structures, Inc. v. Baptist Found. of Tex.*, 166 S.W.3d 443, 451 (Tex. App.—Fort Worth 2005, pet. denied). To conclude that the July 25 letter remained an enforceable promise after July 27 accomplishes the opposite, impermissibly writing the integration clause out of the specification.

18

Holding Stonebriar to the integration clause also aligns with Texas's policy favoring freedom of contract. Texas law gives sophisticated parties "broad latitude in defining the terms of their business relationship[,]" *FPL Energy, LLC v. TXU Portfolio Mgmt. Co., L.P.*, 426 S.W.3d 59, 67 (Tex. 2014), and assumes that they read and understand what they sign, *Nat'l Prop. Holdings, L.P. v. Westergreen*, 453 S.W.3d 419, 426 (Tex. 2015). Stonebriar knew about the July 25 letter, but it ultimately agreed to the July 27 specification, including its integration clause and its conspicuous omission of any reference to the July 25 letter. Stonebriar thus made its legal choice: the July 25 letter existed as a gap-filler until the specification's execution two days later. Stonebriar long ago made the business decision to forgo any protections that the July 25 letter might have otherwise afforded.

## B. Further, Stonebriar did not conclusively prove its entitlement to specific performance.

In any event, the evidence does not conclusively prove that Insight breached the July 25 letter by delivering the landlord waiver unreasonably late, that Stonebriar suffered any of the harm necessary to trigger a right to indemnity under the letter, or that Stonebriar lacks the adequate remedy at law specific performance requires.

**1. Insight only agreed to indemnify Stonebriar; Stonebriar admits, though, that delayed receipt of the landlord waiver caused Stonebriar no harm or damage.**

First, the July 25 letter did not empower Stonebriar to unilaterally unwind the loan merely because Insight had not delivered the landlord waiver. An agreement's meaning turns on "the context in which the words appear and were written — the realities they were meant to address." *Bd. of Regents of Univ. of Texas Sys. v. IDEXX Labs.*, 691 S.W.3d 438, 445 (Tex. 2024). While the letter's last paragraph may confer a repurchase right, it does so in the context of a promise by Insight to "indemnif[y]" Stonebriar and "hold[]" it "harmless" from Insight's inability to obtain the landlord waiver.[54] Using "typical indemnity language[,]" *Wallerstein v. Spirt*, 8 S.W.3d 774, 780 (Tex. App.—Austin 1999, no pet.), Insight thus promised to protect Stonebriar from "existing and/or future loss liability[,]" *see Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993) (defining "indemnity agreement"). In context, the buy-back term only reflects the parties' understanding of that protection's scope: potentially, the value of the loan.

---

[54] CR269, July 25 Letter.

20

Reading the July 25 letter as an offer of indemnity rather than allowing Stonebriar to unwind the loan aligns with Texas's policy against forfeiture. "Courts will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive," and "will not declare a forfeiture unless they are compelled to do so by language which can be construed in no other way." *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987). In other words, any reasonable way to read a contract to avoid forfeiture prevails. *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990). Given the context in which the buy-back clause appears and Insight's repeated admonition that it was providing indemnity, a reasonable reading of the July 25 letter — the only reasonable reading — is that Insight intended to protect Stonebriar from harm, not give Stonebriar a unilateral right to walk away and turn the letter into a liquidated damages clause.

That common-sense construction also avoids interpreting the letter in a way that would make the buy-back clause an illegal penalty. Courts must avoid interpreting contracts to "impose or enforce an illegal obligation." *CHSPSC v. Hansen*, 525 S.W.3d 671, 689 n.10 (Tex. 2017). As actual harm provides the "universal rule" for measuring damages for

21

a breach of contract, parties cannot legitimately agree to a measure of damages that, rather than compensates one for the other's breach, penalizes non-compliance. *E.g.*, *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991). Yet as Stonebriar reads the letter, mere delayed delivery of a document automatically entitles Stonebriar to the claimed multi-million-dollar value of its note. That construction makes it a quintessential penalty, *see, e.g.*, *id.*, and illegal.

As an indemnification, the July 25 letter required only that Insight protect Stonebriar from harm or damage caused by delayed delivery of the landlord waiver. *See generally Dresser Indus., Inc.*, 853 S.W.2d at 508. Stonebriar admittedly suffered none.[55] No evidence supports the breach, materiality, and harm required for Stonebriar to recover.

### 2. Insight delivered the landlord waiver within the reasonable time Texas law afforded it, so it did not violate the July 25 letter.

Because the July 25 letter did not provide a specific date by which Insight had to deliver the landlord waiver, the law implicitly gave Insight a "reasonable time" to do so. *See Wade Contractors, Inc. v. C.W.&A., Inc.*, 589 S.W.2d 505, 507 (Tex. App.—Corpus Christi 1979, writ ref'd n.r.e.).

---

[55] CR455–56, Stonebriar's Answer to Interrogatory 8.

It was thus incumbent upon Stonebriar to prove beyond debate that, considering "the nature and character of the thing to be done[,]" "the difficulty surrounding and attending its accomplishment[,]" and the other "circumstances" of the case, *id.*, Insight's delivery of the landlord waiver in November 2022 was unreasonably late. Stonebriar did not.

Remember first that the landlord waiver served a belt-and-suspenders role as one of multiple mechanisms for protecting Stonebriar's security interest in the equipment. For example, per the master agreement, Insight agreed to "promptly pay" Stonebriar any costs Stonebriar incurred protecting its security interest in the leased equipment.[56] Insight also committed to "promptly" notify Stonebriar of "any event which would have a material adverse effect" on Stonebriar's security interests in the equipment, which included notice of "any lien, security interest, encumbrance, or claim may be or asserted against" the equipment.[57] Its delivery of the landlord waiver was thus but a small part of the overarching scheme protecting Stonebriar's security interest.

---

[56] CR 251, Master Agreement, art. III, §§ 14–15.
[57] CR 253, Master Agreement, art. III, § 25.

The landlord waiver itself said nothing about whether the landlord had — or even claimed — an interest in the leased equipment. By its terms, Legacy's landlord simply "waive[d] and relinquishe[d] . . . any and all liens, security interests, rights, claims and demands of every kind" that it might have against the leased equipment.[58] It neither recognized that the landlord had an interest in the equipment in the first place, nor spoke to the legitimacy of any claimed interest. And the landlord never asserted any such claim, anyway.[59]

Nor was the landlord waiver a predicate to Stonebriar receiving payment: the undisputed evidence is that Stonebriar has and continues to receive monthly payments due to it.[60]

For its part, Stonebriar never acknowledges the reasonable time afforded Insight to deliver the landlord waiver, let alone try to prove or argue that Insight delivered the letter unreasonably late. The thrust of Stonebriar's breach theory is instead that the July 25 letter empowered it to unwind the loan within its "discretion" at any time, so long as Stonebriar had not received the landlord waiver, and to continue to

---

[58] CR402, Landlord Waiver.
[59] CR381, Czaja Declaration.
[60] CR383, Czaja Declaration.

demand that unwinding even long after it received the waiver.[61] Stonebriar confuses a potential remedy with Insight's performance obligation — only if Insight did not deliver the landlord waiver within a reasonable time *and Stonebriar was harmed because of that failure* could Stonebriar then seek indemnity.

Considering all of the circumstances, Stonebriar did not conclusively prove the "unreasonableness" of delivery, nor did Stonebriar show how it was harmed thereby.

**3.    Stonebriar did not show that it lacks a remedy at law.**

Specific performance is an injunctive, and thus equitable, remedy. *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 423 (Tex. 2011). Like other injunctive relief, a party seeking a contract's specific performance must prove that its damages are an inadequate legal remedy. *Id.* The question is not whether specific performance may be a "more efficient means to remedy" a breach, *id.*, but whether "any potential harm may be adequately cured by money damages[,]" *Sw. Sunrise, LLC v. John Gannon, Inc.*, No. 14-22-00551-CV, 2024 WL 1793021, at *3 (Tex. App.—Houston [14th Dist.] Apr. 25, 2024, no pet.)

---

[61] *See* CR235–344, Stonebriar's *Renewed Traditional Motion for Summary Judgement* (Apr. 1, 2024).

(mem. op.). Stonebriar did not plead that it lacked an adequate legal remedy.[62] Stonebriar did not raise that issue in its motion for summary judgment.[63] And Stonebriar did not prove beyond debate that damages would not be an adequate remedy — indeed, the only evidence is that Stonebriar has not suffered any.[64]

## C. Stonebriar did not conclusively prove that it can convey the lease to Insight.

To require Insight to buy back the lease via specific performance, Stonebriar also had to plead and conclusively prove its own readiness, willingness, and ableness to "perform[] its part of the agreement." *Digiuseppe v. Lawler*, 269 S.W.3d 588, 594 (Tex. 2008). That "long recognized and respected" rule imposed a "continuing" burden of proof "extend[ing] to all times relevant to the contract and thereafter." *Id.* at 593. But, at best for Stonebriar, a fact question exists over whether the lease exists anymore. The company not only failed to plead or prove that prerequisite to recovery, but the evidence shows that the leased equipment was sold in connection with Legacy Care's bankruptcy. There remains a legitimate, unanswered question about what exactly remains

---

[62] *See* CR14–22, Original Petition.
[63] *See* CR235–344, Renewed Motion for Summary Judgment.
[64] CR455–56, Stonebriar's Answer to Interrogatory 8.

for Insight to buy back, if anything remains at all, as well as the amount due and how to calculate it.

**II. Because the judgment purports to require Insight to repurchase the lease pursuant to an extrinsic promissory note, and because the lease at issue had previously been rejected by a bankruptcy court, the judgment is unenforceable, unduly vague, and indefinite.**

The trial court's judgment purports to resolve the claim between the parties, but the parties cannot perform the judgment for several reasons. As noted, the judgment directs Insight to buy back the lease for an undetermined amount:

> Insight is therefore ORDERED to repurchase the Equipment Lease Agreement pursuant to the terms of the Repurchase Letter within seven business days of this Final Judgment.[65]

Although the judgment recites that it is a "final, appealable judgment that disposes of all claims between the parties [and] [a]ll relief not expressed granted by this Final Judgment is DENIED[,]"[66] it is erroneously indefinite, vague, and unenforceable. From the judgment's face, neither Insight, the district clerk, nor anyone else can know exactly what Insight must pay, or what Insight will receive for any payments.

---

[65] CR1021–22, Final Judgment.
[66] CR1021–22, Final Judgment.

First, the judgment refers to the July 25 letter, which is an extrinsic document that itself refers to *another* document – a promissory note[67] – that supposedly contains the amount Stonebriar thinks Insight must pay without accounting for years of payments Stonebriar has been receiving. Second, the lease to be "repurchased" has been rejected in bankruptcy and supplanted by new terms with an entirely new, third party. Thus, there are multiple problems with this judgment, including:

- judgments cannot necessitate reference to extrinsic documents in order to determine the parties' obligations under the judgment;

- this defect is amplified in this case because the document referred to – the Repurchase Letter – itself refers to another document – the Promissory Note;

- further exacerbating the invalidity of the judgment is that there is no signed promissory note in the summary judgment record;

- moreover, a repurchase of a lease implies that Stonebriar would transfer back to Insight the rights under the lease – but Stonebriar has no rights as a lessor because it forfeited any rights it had during the bankruptcy of the lessee of the equipment.

---

[67] An executed promissory note is not part of the summary judgment or appellate record. A proposed form of such a note appears at CR262–63.

The law of Texas has long required judgments to, among other things, "conform to the pleadings, the nature of the case proved and the verdict, if any[.]" Tex. R. Civ. P. 301. In *Spiva v. Williams*, the Supreme Court of Texas reversed and remanded a judgment that awarded the plaintiff $978.36, plus ten percent interest, "subject to an offset agreed upon by the parties." 20 Tex. 442, 442–43 (1857). When the plaintiff complained that the judgment was erroneous, the Supreme Court agreed, explaining:

> The very object of a suit is to adjudicate and declare the respective rights of the parties, in a shape so that the ministerial officers can with certainty carry into execution the judgment of the court, without the ascertainment and determination of additional facts. It is obvious that such is not the case here.

*Id.* at 443; *see also Rausheck v. Empire Life Ins. Co. of Am.*, 507 S.W.2d 337, 340 (Tex. App.—Texarkana 1974, writ ref'd n.r.e.) ("It is elementary that a 'judgment must be sufficiently definite and certain to define and protect the rights of all litigants, or it must provide a definite means of ascertaining such rights.'"); *Brook Mays Organ Co., Inc. v. Sondock*, 551 S.W.2d 160, 165 (Tex. App. 1977, writ ref'd n.r.e.) ("The law is well settled that a decree must define in clear, specific and unambiguous terms the duties or obligations imposed upon a party.").

The judgment here, couched in language of "specific performance," requires payment of an uncalculated amount even though Stonebriar pleaded only for "nonmonetary relief." That alone is a violation of Texas Rule of Civil Procedure 301. The trial court erred by ordering Insight to "repurchase the Equipment Lease Agreement" — *i.e.*, to pay Stonebriar whatever amount Stonebriar would later demand. Specific performance is a "substitute for monetary damages when such damages would not be adequate," *Stafford v. S. Vanity Magazine, Inc.,* 231 S.W.3d 530, 535 (Tex. App.—Dallas 2007, pet. denied), and a judgment that orders Insight to pay Stonebriar an undetermined sum of money when compared to Stonebriar's pleading for "specific performance" and "nonmonetary relief" is erroneous on its face.

Further, the judgment is erroneously vague despite its instruction that Insight should act "pursuant to the terms" of the July 25 letter. True enough, "[s]o long as the judgment of the court makes the figure which the clerk is to place in the writ of execution determinable by ministerial act, the judgment cannot be said to lack definiteness." *Int'l Sec. Life Ins. Co. v. Spray,* 468 S.W.2d 347, 350 (Tex. 1971). But the July 25 letter defines the repurchase amount as the outstanding balance of the

promissory note — a note that appears nowhere in the record and with an unproven balance on the date of judgment. Any calculation of the buy-back value, then, impermissibly requires "ascertainment of facts not stated in the judgment itself." *Riner v. Neumann*, No. 05-07-01053-CV, 2008 WL 4938438, at *1 (Tex. App.—Dallas Nov. 20, 2008, no pet.) (mem. op.). Such "determination[s] of issues of fact and law" are quintessentially judicial functions and must be done before the judgment issues. *See Howell v. Mauzy*, 774 S.W.2d 274, 276 (Tex. App.—Austin [3rd Dist.] 1989, writ denied). By failing to do so, the trial court erred, and this judgment must be reversed.

In a similar vein, the trial court's judgment erroneously depends on its construction of a document not even in evidence, ordering Insight to "repurchase the Equipment Lease Agreement pursuant to the terms of the Repurchase Letter." The letter mentioned in the judgment in turn refers to a "Promissory Note" between Stonebriar and Insight, but that document does not appear anywhere in the record. Stonebriar's renewed motion for summary judgment included certain parts of the master agreement and "specification" relating to the Insight/Legacy Lease for

31

the equipment at issue, but not the promissory note.[68] Although Stonebriar provides a declaration from its Chief Risk Officer, Jeffrey L. Wilkison,[69] he simply refers to a "promissory note dated July 27, 2022," without providing a copy of that promissory note. Stonebriar's own summary judgment evidence about the claimed amounts due cannot be reconciled either.[70] Among other things, Stonebriar never accounts for payments it does not dispute that it received through Insight from Legacy, or the payments Stonebriar does not dispute it has been receiving through Insight from the new holder of the equipment.

Finally, the trial court ignored uncontested evidence that there had been a "buyout" of the lease to a third party, to which Stonebriar had tacitly agreed, and which Insight, Legacy, and the third-party buyer had negotiated under the oversight of the Bankruptcy Court in Arizona.[71] Thus, by ordering Insight to "repurchase the Equipment Lease Agreement pursuant to the terms of the Repurchase Letter," the trial court erred. The trial court's judgment must "reflect a correct application

---

[68] *See* CR235–344.

[69] CR271–73, Wilkison Declaration.

[70] *Compare, e.g.*, CR278, CR305, and Supp. CR34.

[71] CR419–20, November 9, 2023 Letter.

32

of the law," or else it is in error. *Salomon v. Lesay*, 369 S.W.3d 540, 554 (Tex. App.—Houston [1st Dist.] 2012, no pet.). "[S]pecific performance will not be decreed where it appears that performance of the contract by the defendant is impossible." *Great Hans, LLC v. Liberty Bankers Life Ins. Co.*, No. 05-17-01144-CV, 2019 WL 1219110, at *6 (Tex. App.—Dallas Mar. 15, 2019, no pet.) (mem. op.). For example, if a defendant no longer owns the land at issue, he cannot be compelled to sell it to the plaintiff. *Id.* The same is true here—Stonebriar did not controvert Insight's summary evidence that the "Equipment Lease Agreement" and the equipment it secures has been part of a "buyout" and asset purchase agreement with an entirely new third party.[72] The summary judgment evidence at the time of the trial court's judgment therefore showed that the "Equipment Lease Agreement" with "Legacy" no longer existed, and Stonebriar did not raise any evidence otherwise.

---

[72] CR419–20, November 9, 2023 Letter. This remains true whether the Court uses the letter's definition of the "Equipment Lease Agreement", *i.e.*, "Lessee: Legacy Sports USA, LLC Equipment Schedule No. 2 to Master Lease Agreement No. 9586 dated September 13, 2021," CR269, or the definition in Stonebriar's Renewed Motion for Summary Judgment, *i.e.*, "Schedule A to Specification No. 1 attached and incorporated Lease Agreement 9586 and Schedule No. 2 to Lease Agreement 9586," CR237.

### III. Insufficient evidence supports the trial court's award of attorneys' fees to Stonebriar.

Finally, Stonebriar is not entitled to attorneys' fees because the judgment must be reversed as noted above, and because Stonebriar failed to prove that the July 25 letter authorized fee-shifting, and that the fees it requested were reasonable and necessary. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 487 (Tex. 2019). Stonebriar did not do either. .

First, the letter does not authorize fee-shifting in a suit to compel specific performance.[73] By the letter's terms, attorneys' fees are part of the "repurchase" price of the note if a "cost[] of collection:

> Insight, at Stonebriar Commercial Finance LLC's sole discretion, shall ***repurchase*** the Equipment Lease Agreement ***for*** the principal outstanding of the Promissory Note, ***plus*** accrued interest at the rate stated in the Promissory Note, ***plus*** all costs of collection including attorney's fees.

Read in the context, then, the attorneys' fee provision applies only when those fees are incurred as a collection cost: "including" means that attorneys' fees are an "example" of the costs recoverable. *See Waak v.*

---

[73] Since Stonebriar sought fees only under the letter, and did not plead for fees under Chapter 38 or any other statute, it waived any ability to seek fees under another contractual term or statute. *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 659 (Tex. 2009).

*Rodriguez*, 603 S.W.3d 103, 108 (Tex. 2020) (explaining that "including" "has meaning" only if read as providing examples of subject). But Stonebriar incurred no collection costs. It has not collected anything from Insight. *See Collect*, American Heritage Dictionary, *available at* American Heritage Dictionary Entry: COLLECT ("To call for and obtain payment of"). The only relief Stonebriar obtained was specific performance of a claimed buy-back obligation, which Stonebriar itself characterizes as "nonmonetary relief." The judgment awarded it no money.

In any event, the fee award lacks evidentiary support. Evidence is factually insufficient when a fee award "is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Christus Health Se. Tex. v. Hall*, No. 09-07-074-CV, 2008 WL 2759785, at *6 (Tex. App.—Beaumont July 17, 2008, no pet.) (mem. op.). The fee claimant bears the burden of providing sufficient evidence of both reasonable hours worked and reasonable hourly rates. *Rohrmoos Venture*, 578 S.W.3d at 487.

Here, Stonebriar claims this is a simple dispute with no contested issues of material fact or law, yet it also claims that it should recover

hundreds of thousands of dollars in attorneys' fees. When compared to the voluminous fee entries sought in this case, the following are particularly problematic for a contract summary judgment in Collin County, Texas:

- 11/11/22 – 6.40 hours billed by Dylan French, a third-year attorney billing at $725.00 per hour, for analyzing documents, researching, drafting Stonebriar's Original Petition, and conferring with Stonebriar's lead counsel;[74]

- 12/21/22–12/23/22 – 12.50 hours for Mr. French at $725.00 per hour for redundant tasks already completed — analyzing documents, conferring with Stonebriar's lead counsel, and drafting Stonebriar's initial motion for summary judgment, which contained fewer than seven pages of substance;[75]

- 1/6/23 – 2.10 hours for Mr. French, still less than four years out of law school, at $890.00 per hour, for drafting Stonebriar's initial disclosures and internal correspondence amongst Stonebriar's counsel;[76]

- 7/30/23–7/31/23 – 4.80 hours for Mr. French at $890.00 per hour, drafting Stonebriar's five-page reply in support of its Motion for Entry of Protective Order;[77]

- 3/15/24–3/25/24 – 9.0 hours for Mr. French at $1,070.00 per hour drafting the Stonebriar's second motion for summary judgment, which differs minimally from Stonebriar's initial dispositive motion;[78]

---

[74] CR873, Time Entries.
[75] CR873, Time Entries.
[76] CR873, Time Entries.
[77] CR875, Time Entries.
[78] CR876, Time Entries.

- 11/11/22–11/17/22 – 5.2 hours for Ms. LeElle Slifer, an eleven-year attorney, at $1,050.00 per hour, including 2.70 hours for revising Stonebriar's Original Petition and conferring with Stonebriar's other counsel and client representative, and 1.5 hours for administrative tasks such as "oversee[ing] petition" and "oversee[ing] service of summons";[79]

- 12/21/22 – 1.50 hours for Ms. LeElle Slifer, at $1,050.00 per hour, conferring with Stonebriar's other counsel (i.e., her associate, Mr. French) and Stonebriar's client representative "regarding MSJ";[80] and

- 12/22/22–12/23/22 – 5.50 hours for Ms. LeElle Slifer, at $1,050.00 per hour, for doing essentially the same tasks throughout the next two days.[81]

Insight filed detailed objections to Stonebriar's attorney fee evidence,[82] and filed the affidavits of Owen Babcock,[83] specifically disputing the necessity and reasonableness of the fees claimed by Stonebriar. Those objections and affidavits raised a fact issue making summary judgment on the fees inappropriate. *Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 353 (Tex. 2020) (party seeking attorneys' fees bears burden of proof and must supply enough facts to support reasonableness of the amount awarded, and insufficient evidence requires reversal).

---

[79] CR878, Time Entries.
[80] CR879, Time Entries.
[81] CR879, Time Entries.
[82] CR868–85, Insight's *Objection to Stonebriar Commercial Finance, LLC's Attorney Fee Evidence* (Aug. 5, 2024).
[83] *E.g.*, CR993–97, Babcock Declaration.

Finally, the judgment awards an astounding $344,000 in conditional appellate fees, which were also objected to. The trial court erred in awarding that sum, even as conditional fees, as the amount is not supported by sufficient evidence.

## PRAYER

The Court should reverse the trial court's judgment, hold that the July 25 letter is unenforceable parol evidence, and remand for further proceedings. Insight also asks for all other relief to which it may be entitled at law and in equity.

\*\*\*

Respectfully submitted,

*/s/ Thomas C. Wright___*
Thomas C. Wright
State Bar No. 22059400
Rachel H. Stinson
State Bar No. 24037347
Kyle C. Steingreaber
State Bar No. 24110406
**WRIGHT CLOSE & BARGER, LLP**
One Riverway, Suite 2200
Houston, Texas 77056
(713) 572-4321 - Telephone
(713) 572-4320 - Facsimile
wright@wrightclosebarger.com
stinson@wrightclosebarger.com
steingreaber@wrightclosebarger.com

**Counsel for Appellant Insight
Investments, LLC**

## CERTIFICATES

## Rule 9.4(i)(3) Certification

Based on a word count run in Microsoft Word, this brief contains 7,197 words, excluding the portions of the brief exempt from the word count under Texas Rule of Appellate Procedure 9.4(i)(1).

*/s/ Thomas C. Wright*
Thomas C. Wright


## Certificate of Service

I certify that on March 7, 2025, a true and correct copy of this response was served via electronic service through eFile.TXCourts.gov on all parties through counsel of record.

*/s/ Thomas C. Wright*
Thomas C. Wright

# In the
# 𝕱ifteenth Court of Appeals
## Austin, Texas

Insight Investments, LLC
*Appellant*

v.

Stonebriar Commercial Finance, LLC
*Appellee*

On appeal
From the 380th Judicial District Court, Collin County, Texas
Cause No. 380-06242-2022

## Appendix to Appellant's Brief

Insight attaches the following materials under Texas Rule of Appellate Procedure 38.1(k).

\*\*\*

| App'x No. | CR/RR | Document |
|---|---|---|
| 1 | CR1021–22 | Final Judgment |
| 2 | CR820–21 | Partial Summary Judgment Order |
| 3 | CR248–64 | Master Agreement |
| 4 | CR266–67 | July 27 Specification |
| 5 | CR402–17 | Landlord Waiver |
| 6 | CR268 | July 25 Letter |

# App'x 1

## (Final Judgment)

Filed: 9/5/2024 5:23 PM
Michael Gould
District Clerk
Collin County, Texas
By Natika Dixon Deputy
Envelope ID: 91703149

Cause No. 380-06242-2022

| | | |
|---|---|---|
| STONEBRIAR COMMERCIAL FINANCE LLC, | § § § | IN THE DISTRICT COURT OF |
| | § | COLLIN COUNTY, TEXAS |
| Plaintiff, | § § | |
| v. | § § | |
| | § | 380th JUDICIAL DISTRICT |
| INSIGHT INVESTMENTS, LLC, | § § | |
| Defendant. | § § | **JURY TRIAL DEMANDED** |

## [PROPOSED] FINAL JUDGMENT

Upon consideration of Plaintiff Stonebriar Commercial Finance LLC's ("Stonebriar") Renewed Traditional Motion for Summary Judgment ("Renewed MSJ"), for the reasons set forth by Stonebriar, and based on the entire record herein, including the pleadings, arguments of counsel, if any, and evidence submitted by the parties—including the evidence submitted in connection with the August 6, 2024 hearing on attorneys' fees and costs—the Court GRANTS Stonebriar's Renewed MSJ in its entirety and renders judgment in favor of Stonebriar on Stonebriar's claims for breach of contract and attorneys' fees. Insight's Objections to Stonebriar's Renewed Traditional MSJ are OVERRULED, and Insight's Motion for Rehearing and New Trial is DENIED.

Insight is therefore ORDERED to repurchase the Equipment Lease Agreement[1] pursuant to the terms of the Repurchase Letter within seven business days of this Final Judgment. Insight is further ORDERED to pay Stonebriar's reasonable and necessary attorneys' fees and costs in the amount of $ 291,341.00. In addition, Stonebriar is awarded conditional appellate attorneys' fees and costs in the amount of $160,800 for any appeal to the intermediate court of appeals. Stonebriar is further award conditional appellate attorneys' fees and costs in the amount of $183,630 for any appeal to the Supreme Court of Texas (consisting of $66,840 for the petition for review stage, and $116,790

---

[1] Capitalized terms not otherwise defined in this Final Judgment have the meaning given to them in Stonebriar's Renewed MSJ.

**1021**

for the merits briefing stage, oral argument, and conclusion of the appeal).

This is a final, appealable judgment that disposes of all claims between the parties. All relief not expressed granted by this Final Judgment is DENIED.

9/16/2024
_____
DATE

*Benjamin A. Smith*
_____
PRESIDING JUDGE

# App'x 2

## (Partial Summary Judgment Order)

Filed: 5/2/2024 11:53 PM
Michael Gould
District Clerk
Collin County, Texas
By Johnna Meadows Deputy
Envelope ID: 87338191

Cause No. 380-06242-2022

| | | |
|---|---|---|
| STONEBRIAR COMMERCIAL FINANCE LLC, | § § § | IN THE DISTRICT COURT OF |
| | § | COLLIN COUNTY, TEXAS |
| Plaintiff, | § § | |
| v. | § § | |
| | § | 380th JUDICIAL DISTRICT |
| INSIGHT INVESTMENTS, LLC., | § § | |
| | § § | |
| Defendant. | § | **JURY TRIAL DEMANDED** |

### [PROPOSED] ORDER GRANTING PLAINTIFF'S RENEWED TRADITIONAL MOTION FOR SUMMARY JUDGMENT

Upon consideration of Plaintiff Stonebriar Commercial Finance LLC's ("Stonebriar") Renewed Traditional Motion for Summary Judgment, for the reasons set forth by Stonebriar, and based upon the entire record herein, including the pleadings, the evidence submitted by the parties, and the arguments of counsel, if any, it is:

ORDERED that Stonebriar's Renewed Traditional Motion for Summary Judgment is GRANTED in its entirety, and Insight Investment, LLC's ("Insight") Objections to Stonebriar's Renewed Traditional Motion for Summary Judgment are OVERRULED.

Insight is therefore ORDERED to repurchase the Equipment Lease Agreement pursuant to the terms of the Repurchase Letter within seven business days of this Order.[1] Insight is FURTHER ORDERED to pay Stonebriar's reasonable and necessary attorneys' fees and all costs incurred in this litigation. If Stonebriar and Insight are unable to agree on the amount of reasonable fees and costs incurred, Stonebriar shall set a date for an evidentiary hearing before the Court to resolve the issue of fees and costs.

---

[1] Capitalized terms not otherwise defined in this order have the meaning given to them in Stonebriar's Renewed Traditional Motion for Summary Judgment.

**820**

All relief not expressly granted by this Order is DENIED.


SO ORDERED.

Dated: ___5/6/2024___

*Benjamin N. Smith*
PRESIDING JUDGE

# App'x 3

**(Master Agreement)**

# MASTER NON-RECOURSE SECURITY AGREEMENT AND ASSIGNMENT

MASTER NON-RECOURSE SECURITY AGREEMENT AND ASSIGNMENT (this "**Agreement**"), dated April 11, 2022 between **Insight Investments, LLC**, a Delaware limited liability company (the "**Debtor**") having its principal office at **611 Anton Boulevard Suite-700, Costa Mesa, California, 92626** and Stonebriar Commercial Finance LLC, a Delaware limited liability company (the "**Secured Party**") having its principal office at 5601Granite Parkway, Suite 1350, Plano, Texas 75024.

## Article I

This Agreement sets forth the terms and conditions pursuant to which Secured Party and Debtor may, from time to time, enter into specifications incorporating this Agreement (each a "**Specification**"), in substantially the form attached hereto as **Exhibit 1**, pursuant to which Secured Party will lend money to Debtor and Debtor will grant a security interest to Secured Party in designated collateral. Each Specification constitutes a separate and independent agreement between the parties.

## Article II

1.  To secure the payment and performance of the Obligations (as hereinafter defined) under a Specification, Debtor hereby grants to Secured Party a security interest in and to the following property of Debtor, whether now owned or existing or hereafter created or arising (herein, collectively referred to as the "**Collateral**"): (i) the contract identified in Schedule A to the Specification (the "**Contract**"), together with any and all amounts due, to become due or paid to or for the benefit of Debtor thereunder of every kind and description including, without limitation, all rents, stipulated loss or casualty value payments, early termination payments, purchase option payments and renewal option payments; (ii) the personal property subject to such Contract, whether constituting equipment, inventory, fixtures or other (together, the "**Equipment**") and other items leased or financed under such Contract (together with the Equipment, the "**Financed Items**"), together with proceeds of the sale, re-lease or other disposition thereof; (iii) all guaranties and other supporting obligations with respect to such Contract obligations (each a "**Guaranty**", and each obligor thereunder a "**Guarantor**"); (iv) all of Debtor's right, title and interest in and to the Financed Items and any and all substitutions, replacements, attachments, additions and accessions thereto or therefor and all proceeds thereof, including, without limitation, insurance proceeds and the proceeds of all leases, subleases, lease extensions and all other dispositions thereof; all accounts arising in connection with the Contract; and (vi) all proceeds of the foregoing. The Contract, the Guaranty and the other Contract documents identified in the Specification are hereinafter referred to as the "**Contract Documents**" and the obligor under such Contract (the "**Customer**") and Guarantors of such Contract are together hereinafter referred to as the "**Obligors**".

2.  Unless otherwise set forth in the Specification, Debtor shall direct each Obligor to pay all periodic payments and other sums due and to become due under the Contract Documents directly to the Secured Party. In the event that an Obligor inadvertently pays any such sums to Debtor, Debtor agrees that Debtor shall segregate and hold said sums solely as trustee for Secured Party, and Debtor agrees to immediately forward such payments to Secured Party in the form which they are received, with any necessary endorsement.

3.  The term "**Obligations**" collectively means and includes: (i) Secured Party's loan (together with any extension, renewal, modification, extension or refinancing thereof, the "**Loan**") in the principal amount set forth in and evidenced by a promissory note executed by Debtor in connection with the Specification in substantially the form attached hereto as **Exhibit 2** (together with any extension, renewal, modification, extension or refinancing thereof, hereinafter referred to as the "**Note**"), including all principal, interest, late charges and any prepayment premium due and to become due under the Loan and/or Note, (ii) Debtor's obligations and liabilities arising out of Debtor's covenants, warranties, representations and agreements contained in this Agreement, (iii) advances made by Secured Party to pay or discharge any other lien, security interest or encumbrance upon the Collateral, (iv) advances made by Secured Party to protect the Collateral or Secured Party's security interest or lien therein, (v) all costs and expenses (including reasonable attorneys' fees) incurred by Secured Party in the collection of the Note and any other Obligations or in the enforcement of Secured Party's security interest and other rights

in the Collateral or the sale or other disposition of the Collateral or any portion thereof, and (vi) all other amounts now or hereafter owed by Debtor to Secured Party under the terms of this Agreement.

4.    Debtor hereby irrevocably authorizes Secured Party at any time, and from time to time, to file in any jurisdiction any financing statements and amendments thereto or assignments of financing statements identifying Debtor as the debtor and the Collateral as the collateral. Debtor hereby ratifies and affirms its authorization for any financing statements, assignments and/or amendments thereto, executed and/or filed by Secured Party in any jurisdiction prior to the date hereof. Debtor shall reimburse Secured Party for all filing and recording fees (together with any recordation tax, if applicable) incurred by Secured Party under this Section 4.

5.    Except as otherwise agreed to by Debtor and Secured Party in writing or otherwise set forth herein, the Note is non-recourse and Debtor shall not be personally liable for the payment of any principal or interest due under the Note; provided, however that if the Note is prepaid, Debtor shall be obligated on a full-recourse basis to pay the Prepayment Fee (as defined below) to Secured Party. The foregoing sentence shall not limit, restrict or impair the right of the Secured Party to proceed against Debtor for damages (which may include loss of principal and/or interest, costs and reasonable attorneys' fees) incurred by Secured Party resulting from: (a) the breach of any covenant made by Debtor herein or (b) any representation or warranty of Debtor contained herein being incomplete, incorrect or misleading in any material respect when made.

## Article III

## Debtor's Covenants, Representations and Warranties

Debtor covenants, represents and warrants to Secured Party as of the date of the Specification and, as applicable, to the subject Contract that:

1.    Debtor is a corporation or limited liability company (as applicable) duly organized and validly existing in good standing under the laws of the State of Delaware (the "**State of Formation**"), is duly qualified to transact business in the jurisdiction in which the Financed Items are located and in every other jurisdiction where failure to so qualify would have a material adverse effect on its ability to perform its obligations under the Agreement, the Note or the Contract Documents. Debtor's exact legal name is set forth in the first paragraph on page 1 of this Agreement and on the signature page hereof.

2.    The information set forth on the Specification and on each and every schedule and exhibit attached thereto and in each Contract Document and in the notice of assignment delivered by Debtor to Secured Party in connection with the Specification (the "**Notice of Assignment**") is true, correct, and complete in all material respects.

3.    The Financed Items are leased or, as applicable, financed to Customer pursuant to the Contract. Except for (i) the security interest granted hereby, and (ii) each Customer's rights under the applicable Contract, Debtor has title to (or a first priority perfected security interest in) the Equipment and sole title to the Contract Documents, the payments due and to become due thereunder (the "**Payments**") and the other Collateral, free and clear of (or superior to) all liens and encumbrances. Debtor will defend the Collateral against all claims and demands of any Person at any time claiming the same or any interest therein which claims or demands Secured Party deems adverse to its interests.

4.    Except as set forth in the Specification, Customer has not made any advance Payments or delivered any security deposits under the Contract.

5.    Debtor's execution of this Agreement, the Note and the Contract Documents and each Obligor's execution of the Contract Documents have been duly authorized by all necessary action and create binding obligations of such Persons as stated therein, whether signed manually or electronically. Each of this Agreement, the Note and the Contract Documents are in full force and effect and enforceable in accordance with its terms, except as may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditor's rights in general.

6.  The entering into and performance by Debtor of the Agreement, the Note and the Contract Documents will not violate any provision of Debtor's organizational documents, or any applicable judgment, order, writ, injunction, decree, rule, law or regulation of any court, administrative agency or other governmental authority applicable to Debtor, or result in any breach of, or constitute a default under, or result in the creation of any lien, charge, security interest or other encumbrance upon the Collateral or any Contract Documents pursuant to any indenture, mortgage, deed of trust, contract, bank loan or credit (other than the security interest granted to Secured Party hereunder).

7.  No consent or approval of, giving of notice to, registration with, or taking of any other action in respect of or by, any state, Federal or other governmental authority or agency or commission is required with respect to the execution or performance by Debtor of this Agreement, the Note or any Contract Document. No consent or approval of, or giving of notice to, any other Person (other than consents that have been obtained and notices given, true and complete copies of which consents and/or notices have been delivered to Secured Party) is required with respect to the assignment by Debtor of any interest in any Collateral to Secured Party.

8.  Debtor has satisfied all judgments and is not in default with respect to any judgment, writ, injunction, decree, rule, or regulation of any court, arbitrator, or federal, state, municipal, or other governmental authority, commission, board, bureau, agency, or instrumentality, domestic or foreign that would have an material adverse effect upon Secured Party's rights under this Agreement or the Note, Secured Party's interests in the Collateral or Debtor's ability to perform its obligations under this Agreement, the Note or the Contract Documents. There is no action, suit or proceeding pending or, to Debtor's knowledge, threatened against or affecting Debtor before or by any court, administrative agency or other governmental authority which brings into question the validity of the transactions contemplated by the Agreement, the Note or the Contract Documents or which might materially adversely affect the financial condition of Debtor or the ability of Debtor to fulfill its obligations under this Agreement, the Note or the Contract Documents. Debtor will promptly notify Secured Party of any such action, suit or proceeding promptly after the commencement thereof.

9.  Debtor is in material compliance with all statutes, ordinances, governmental rules and regulations to which it is subject and has not and shall not fail to obtain any licenses, permits, franchises, or other governmental authorizations necessary to the ownership of its properties or to the conduct of its business, which violation or failure to obtain would adversely affect the business, prospects, profits, properties, condition (financial or otherwise) of Debtor, Debtor's ability to perform the Obligations or the security interest, liens or rights of Secured Party in the Collateral. Debtor has filed and shall continue to file when due (subject to any permitted extension) all tax returns (federal, state and local) required to be filed and has paid (and shall continue to pay when due) all taxes, assessments, and governmental charges and levies thereon due, including interest and penalties. The transaction set forth in the Contract Documents conforms to all applicable laws and regulations.

10. The Financed Items have been delivered, installed, as applicable, and irrevocably accepted by Customer under the terms of the Contract and are and shall be kept at the location(s) designated in the Contract, where Secured Party may inspect them at any reasonable time as limited by the Contract. Debtor will not remove any Financed Items from said location without the prior written consent of Secured Party nor permit any such removal except as permitted by the Contract. Debtor shall promptly advise Secured Party of any change in the location of any the Financed Items upon Debtor gaining knowledge thereof and, at Debtor's expense, authorizes Secured Party to prepare and file such additional financing statements and other instruments deemed necessary by Secured Party to continue the perfection and priority of Secured Party's security interest therein. Notwithstanding the foregoing, Debtor agrees that the Secured Party's security interest in the Financed Items granted herein by Debtor shall attach to the Financed Items wherever they may now or hereafter be located. Except to the extent that Customer has expressly assumed such obligations under the Contract, Debtor shall keep the Financed Items in good repair, free from waste, misuse, abuse or deterioration, excluding ordinary wear and tear, and cause the Financed Items not be used in violation of any law, ordinance or regulation of any governmental authority insofar as it adversely affects the value of the Contract, the Financed Items or the security interest granted hereunder. The Equipment is not affixed to real estate and Debtor shall not permit the Equipment to become affixed to real estate without the prior written consent of Secured Party.

11. All risks of loss, theft, damage, or destruction of the Financed Items shall be borne by the Debtor (except to the extent that Customer has expressly assumed such risks under the Contract). To Debtor's knowledge, no casualty has occurred with respect to any of the Equipment. Except to the extent that Customer has expressly assumed such obligation under the Contract, Debtor agrees, at its expense, to keep the Financed Items insured against all risks of loss, theft, damage or destruction with extended coverage for not less than the greater of the indebtedness secured hereby or their full replacement cost. The Financed Items shall be insured with such carriers and in such amounts and against such risks as shall be reasonably satisfactory to Secured Party, with policies payable to both Secured Party and Debtor, as their interests may appear. All policies of insurance shall provide for thirty days' prior written notice of cancellation to Secured Party and Debtor shall furnish Secured Party with a certificate of insurance or other satisfactory evidence of compliance with the above requirements. Secured Party shall be named "lender loss payee" for the casualty insurance and "additional insured" for public liability insurance. Debtor hereby appoints Secured Party as attorney for Debtor to negotiate insurance settlements and endorse settlement drafts with respect to the Collateral. If requested, Debtor shall also provide Secured Party with a Lender's Loss Payable Endorsement. Debtor shall promptly notify Secured Party of any loss or damage to the Collateral or any portion thereof, or of any theft, destruction or requisition of the Collateral or any portion thereof.

12. Except to the extent that Customer is legally obligated to do so, Debtor will timely report and pay or cause to be paid when due all taxes and assessments upon the Collateral, its operation or use and or upon the Contract or amounts payable thereunder.

13. At its option, and without any obligation to do so, Secured Party may discharge or pay any taxes, liens, security interests or other encumbrances at any time levied or placed on or against the Collateral or Debtor in breach of this Agreement or the Contract and may pay for insurance on the Collateral (but only to the extent such insurance is required to be maintained under the Contract) and may pay for its maintenance and preservation, provided that Secured Party shall have provided to Debtor at least ten (10) days prior written of its intent to make such payment or incur such expense and Debtor shall have failed to rectify such cause within such ten (10) day period. Debtor agrees to reimburse Secured Party on demand for any such payment made or expense incurred. All payments made by Secured Party under this paragraph shall be deemed additional Obligations secured by the Collateral pursuant to the terms hereof and shall bear interest at the interest rate specified in the Note from the date incurred to the date of payment.

14. Debtor will not cause or permit the Collateral, or any portion thereof, to be sold, transferred, assigned, encumbered, modified (except to the extent permitted in the Contract without Debtor's consent) or disposed of, without the prior written consent of Secured Party.

15. Debtor will promptly pay Secured Party for any and all sums, costs and expenses which Secured Party may pay or incur in defending, protecting or enforcing the security interest granted herein or enforcing this Agreement or payment of the Note, including, but not limited to, all court costs and reasonable attorneys' fees all of which, together with interest calculated at 1-1/2% per month, shall be part of the Obligations.

16. Except as otherwise set forth in Paragraph 17 below, (a) Debtor has delivered to Secured Party the original Contract, true and complete copies of any master agreement to which the Contract is a schedule, all amendments and modifications thereto and all other Contract Documents, said original Contract is the sole and exclusive Contract counterpart deemed "chattel paper" under the Uniform Commercial Code and all other original counterparts of the Contract in existence are marked on their faces and signature pages to indicate that they do not constitute "chattel paper"; or (b) Debtor has delivered to Secured Party true and complete copies of the Contract and any master agreement to which the Contract is a schedule, all amendments and modifications thereto and all other Contract Documents and either (i) no "wet-ink" original Contract exists; or (ii) Debtor is in possession of the sole and exclusive Contract counterpart deemed "chattel paper" under the Uniform Commercial Code, Debtor shall hold such original Contract in trust for the sole benefit of Secured Party and will deliver it to Secured Party upon request and all other original counterparts of the Contract in existence are marked on their faces and signature pages to indicate that they do not constitute "chattel paper"

17. To the extent that any document comprising and/or relating to a Contract Lease has been electronically authenticated (each such document an "**E-document**") by any party thereto by use of the DocuSign or other nationally recognized e-signature platform (each an "**E-document Platform**"): (i) such E-document has been authenticated by an authorized representative of the parties thereto and such E-document constitutes a valid and binding obligation of such parties, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization or other similar laws affecting the enforceability generally of the rights of creditors or lessors; (ii) such E-Document is in compliance with the applicable provisions of the Uniform Electronic Transactions Act (as adopted by the applicable jurisdiction) and the federal Electronic Signatures in Global and National Commerce Act; and (iii) if a Contract is an E-document and is of a nature that would constitute chattel paper under the Uniform Commercial Code as enacted in the State of Delaware (the "**UCC**"), such Lease Schedule constitutes "Electronic Chattel Paper" as defined in Section 9-102 of the UCC and, in conjunction with the E-document Platform, the requirements of Section 9-105 of the UCC are satisfied such that, at all times when Secured Party has an interest in the Contract under this Agreement, Secured Party shall be deemed to control of the single authoritative copy of such Contract for the purposes of Section 9-105 of the UCC and Debtor covenants to take such actions and/or provide such authorizations as Secured Party may reasonably request in order to evidence such control by Secured Party of the Contract in the context of the E-document Platform, including, without limitation, papering out such Contract.

18. No event has occurred that was, is or would, with the delivery of notice and/or passage of time, be an event of default by Customer or Debtor under any Contract Document. No Obligor has or will have any defenses, set-offs or counterclaims under any Contract Document against Debtor or any other Person.

19. There are no agreements, undertakings or other documents relating to the Contract which are not contained in the Contract Documents or which have not been previously furnished to Secured Party. The Contract is the entire agreement between Debtor and Customer with respect to the subject matter thereof and the Guaranty is the entire agreement between the Debtor and the Guarantor with respect to the subject matter thereof.

20. Debtor's chief executive office and principal place of business are located at its address listed above. Debtor shall not change its legal name or the location of its chief executive office or principal place of business except upon thirty (30) days' prior written notice to Secured Party. In the event of such change, Debtor, at its expense, shall prepare and file such additional UCC financing statements and other instruments deemed necessary by Secured Party to continue the perfection and priority of Secured Party's security interest in the Collateral. Debtor has not changed its legal name nor operated under any trade name or other name within the previous five years. Debtor will not change its organizational identification number, if it has one, its type of organization, its jurisdiction of organization or other legal structure.

21. Debtor has not sold, or contracted to sell, any interest in any of the Financed Items or any other part of the Collateral.

22. Debtor will not declare a default under or exercise any remedies under any Contract Document or enter into or permit any cancellation, termination, amendment, supplement or modification of or waiver with respect to any Contract Document or any of Debtor's rights thereunder or give any consent or approval as to any matter arising out of any Contract Document without Secured Party's prior written consent. Debtor has not and shall not waive or forbear upon any of its rights under any Contract Document that may be adverse to Secured Party's interest, as determined by Secured Party.

23. Debtor shall furnish Secured Party, promptly after receipt thereof by Debtor, all financial statements received by Debtor from Customer.

24. The Loan, including interest rate, fees and charges as contemplated hereby: (i) is an exempted transaction under the Truth In Lending Act, 12 U.S.C. 1601 et seq., as amended from time to time, and (ii) does not, and when disbursed shall not, violate the provisions of the Delaware usury laws, any consumer credit laws or the usury laws of any state which may have jurisdiction over this transaction, Debtor or any of the Collateral.

25. Debtor will advise Secured Party promptly, in reasonable detail, of (i) any lien, security interest, encumbrance, or claim made by or asserted against any or all of the Collateral, and (ii) the occurrence of any other event which would have a material adverse effect on the aggregate value of such Collateral or on the security interests and liens with respect to such Collateral created hereunder.

26. Debtor will not, without the prior written consent of Secured Party, wind up, liquidate, or dissolve itself, reorganize, merge or consolidate with or into, or convey, sell, assign, transfer, lease, or otherwise dispose of (whether in one transaction or a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to any Person, or enter in the sale of any capital stock or other equity interests of Debtor.

27. Debtor shall invoice the Payments and otherwise administer and manage the Contract with the same standard of care that Debtor applies to accounts administered by Debtor for its own benefit, but in no event with less than a commercially reasonable standard of care. Debtor shall have no authority to, and except as expressly set forth herein will not, without Secured Party's prior written consent, accept Payments due or to become due under any Contract Document or repossess or consent to the return of any Financed Items without the prior written consent of Secured Party. All Payments received by Debtor shall be deemed held in trust by Debtor for the sole benefit of Secured Party until the Note and all other amounts due hereunder have been paid in full. All amounts collected by Debtor in connection with the Contract shall be applied first to the Payments then due and owing under the Note.

28. If the Customer is a governmental subdivision or other entity subject to appropriation, funds have been appropriated for payment of the Payments for the Customer's current fiscal year, Debtor has no knowledge that Customer will not or may not seek sufficient appropriation for payment of the Payments for any subsequent fiscal year or any threat of non-appropriation for any subsequent fiscal year and, to the best of Debtor's knowledge, all applicable bidding requirements were satisfied with respect to the Contract and the Financed Items are essential use items.

Neither Debtor nor any Obligor is (A) a person whose name appears on the list of Specially Designated Nationals and Blocked Persons published by the Office of Foreign Assets Control, United States Department of the Treasury ("**OFAC**") (an "**OFAC Listed Person**"), (B) an agent, department, or instrumentality of, or is otherwise beneficially owned by, controlled by or acting on behalf of, directly or indirectly, (1) any OFAC Listed Person or (2) any person, entity, organization, foreign country or regime that is subject to any OFAC sanctions program, or (C) otherwise blocked, subject to sanctions under or engaged in any activity in violation of other United States economic sanctions (collectively, "**U.S. Economic Sanctions**") (each OFAC Listed Person and each other Person, entity, organization and government of a country described in clause (A), clause (B) or clause (C), a "**Blocked Person**"). No part of the proceeds from any Loan constitutes or will constitute funds obtained on behalf of any Blocked Person or will otherwise be used by Debtor, any Obligor or any affiliate of either thereof, directly or indirectly, (A) in connection with any investment in, or any transactions or dealings with, any Blocked Person, or (B) otherwise in violation of U.S. Economic Sanctions. None of Debtor, any Obligor nor any affiliate of either thereof (A) has been found in violation of, charged with, or convicted of, money laundering, drug trafficking, terrorist-related activities or other money laundering predicate crimes under the Currency and Foreign Transactions Reporting Act of 1970 (otherwise known as the Bank Secrecy Act), the USA PATRIOT Act or any other United States law or regulation governing such activities (collectively, "**Anti-Money Laundering Laws**") or any U.S. Economic Sanctions violations, (B) to Debtor's actual knowledge after making due inquiry, is under investigation by any governmental authority for possible violation of Anti-Money Laundering Laws or any U.S. Economic Sanctions violations, (C) has been assessed civil penalties under any Anti-Money Laundering Laws or any U.S. Economic Sanctions, or (D) has had any of its funds seized or forfeited in an action under any Anti-Money Laundering Laws.

Secured Party's knowledge at any time of any breach of or noncompliance with any of the foregoing covenants, representations or warranties shall not constitute a waiver by Secured Party.

For the avoidance of doubt, and notwithstanding anything to the contrary herein, all covenants set forth in this Article III are ongoing covenants of Debtor and shall be true and correct so long as any Obligations remain outstanding.

## Article IV

1. Confirmatory of its grant of security interest in the Contract, to further secure payment and performance of the Note and all other Obligations, Debtor hereby collaterally assigns and transfers to Secured Party all right, title, interest, estate, claim and demand in, to and under the Contract and the Equipment, including, without limitation, any and all rents, stipulated and casualty loss value payments, early termination payments, proceeds of the sale, re-lease or other disposition of the Financed Items, amounts payable by reason of Customer's default under the Contract or by reason of damage or loss to the Financed Items, insurance loss payments, any and all other amounts due under the Contract of every kind and description, all supporting obligations for the Contract, and the proceeds of the foregoing. The aforesaid collateral assignment shall be effective and operative immediately and shall continue in full force and effect and Secured Party shall have the right to collect and receive all said rents and other payments (and all other proceeds of the Collateral) at all times during the period from and after the date of this Agreement until the indebtedness evidenced by the Note and all other Obligations shall be paid in full and discharged. Secured Party does not by this collateral assignment assume any of the obligations of Debtor or any other party under the Contract and Secured Party shall not be responsible in any way for the performance by Debtor or any other party of the terms and conditions of the Contract. Debtor is, and shall remain, liable under the Contract to perform all obligations assumed by it thereunder, which may be performed by Secured Party without releasing the Debtor therefrom.

2. Debtor irrevocably constitutes Secured Party, its successors and assigns, Debtor's attorney with full power (in the name of Debtor or otherwise) to demand, receive and give release for any and all moneys and claims for moneys due and to become due under or arising out of the Contract, to endorse any checks or other instruments or orders in connection therewith, to give all or any of the notices, consents, instructions or other communications reserved to Debtor in the Contract and to file any claims or take any action to institute any proceedings, legal, equitable or otherwise, which Secured Party deems necessary or appropriate to create, perfect, protect and preserve Secured Party's security interest and rights in the Collateral, all without affecting Debtor's liability in any manner.

3. Debtor agrees that at any time and from time, upon the written request of Secured Party, Debtor will promptly and duly execute and deliver any and all such further instruments and documents as Secured Party may deem desirable in obtaining the full benefit of this Agreement and of the rights and powers herein granted.

4. Debtor hereby agrees to perform its obligations under the Contract, to exercise promptly and diligently every right it may have under the Contract (provided such exercise shall not be adverse to Secured Party, or inconsistent with any of the Debtor's covenants, representations or warranties made herein), to immediately notify Secured Party, or any subsequent assignee of which it has notice, of any default or alleged default by any party to any Contract Document of any termination or threatened termination thereof or of any notice from Customer or Guarantor that is material to Secured Party's interests in any Collateral.

## Article V

Any of the following events shall constitute an event of default (an "**Event of Default**") hereunder:

1. Debtor shall fail to make payment of any part of the principal of or interest on the Note or any of the other Obligations when due and such default shall not be cured within ten (10) days after the Secured Party has given notice of such default to Debtor; or

2. Debtor shall default in the due observance or performance of any term, covenant or representation contained in this Agreement, or in any other document made and delivered by Debtor to Secured Party, and such default shall not be cured within fifteen (15) days after Secured Party has given notice of such default to Debtor; or

3. Debtor shall remove, sell, transfer, assign, encumber, sublet or otherwise dispose of the Collateral or any portion thereof or attempt to do any of the foregoing without first obtaining Secured Party's prior written consent thereto; or

4. The Customer shall be in default under the Contract or shall breach or fail to perform or observe any representation, covenant or obligation set forth in the Notice of Assignment; or

5. Debtor, any subsequent owner of the Equipment, Customer or any Guarantor shall cease doing business as a going concern, make an assignment for the benefit of creditors, admit in writing its inability to pay its debts as they become due, file a voluntary petition in bankruptcy, be adjudicated a bankrupt or an insolvent, file a petition seeking for itself any reorganization, readjustment, liquidation, dissolution or similar arrangement under any present or future statute, law or regulation or file an answer admitting the material allegations of a petition filed against it in any such proceeding or fail to have such petition dismissed within thirty (30) days after filing, or consent to or acquiesce in the appointment of a trustee, receiver or liquidator of it or all or any substantial part of its assets or properties; or

6. Any certificate, statement, representation, warranty or audit contained herein or heretofore or hereafter furnished with respect hereto by or on behalf of Debtor is proven to have been incomplete, incorrect or misleading in any material respect at the time as of which the facts therein set forth were stated or certified, or having omitted any substantial contingent or unliquidated liability or claim against Debtor; or

7. If the validity or effectiveness of this Agreement, the Contract or its collateral assignment or grant of security interest by Debtor to the Secured Party, shall be impaired, or if the Contract shall be amended, encumbered, subordinated, terminated or discharged or if Customer shall be released from any of its covenants or obligations under the Contract, in each case except to the extent that the same shall be caused by or shall occur with the express prior written consent of Secured Party; or

8. There shall occur any uninsured damage to or loss, theft, destruction or requisition of the Equipment or any portion thereof; or

9. If all or any portion of the Collateral is attached, seized, levied upon or subjected to a writ or distress warrant, or comes within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors; or an application is made by the Debtor or any other Person for the appointment of a receiver, trustee, or custodian for such Collateral; or

10. If a notice of lien, levy or assessment is filed of record with respect to the Collateral or all or any substantial portion of Debtor's or any Guarantor's assets by the United States, or any department, agency or instrumentality thereof, or by any state, county, municipal or other governmental agency, or any taxes or debts owing to any of the foregoing becomes a lien or encumbrance upon all or any portion of Debtor's or any Guarantor's assets; or

11. If Secured Party receives a notice from any other secured party of a proposed disposition of the Collateral or any portion thereof or otherwise learns of any such proposed disposition (whether or not such security interest is permitted by the terms of this Agreement; nothing in this subsection shall be construed to constitute consent by Secured Party to the creation of any security interest in the Collateral other than the Secured Party's security interest); or

12. Any individual Guarantor shall die, or become incompetent, or any Guarantor shall terminate, repudiate, revoke or disavow any of his or its obligations under his or its guaranty of the Contract or Note, as applicable, or breach any of the terms of such guaranty or any such guaranty shall cease to be in full force and effect or shall be declared null and void, or if any Guaranty shall be released from any of its obligations under its guaranty of the Contract without the prior written consent of Secured Party; or

13. This Agreement shall at any time after its execution and delivery and for any reason cease (i) to create a valid and perfected first priority security interest in the Collateral, subject only to Customer's leasehold rights in the Equipment under the Contract, or (ii) to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by Debtor or Debtor shall deny it has any further liability or obligation hereunder; or

14. Any proceeding shall be commenced or filing made under applicable law by any shareholder, officer, director, member, manager or other equity owner of Debtor to dissolve or liquidate the Debtor or any order, judgment or decree shall be entered against Debtor decreeing its involuntary dissolution or split up, or Debtor shall otherwise dissolve, wind-up or cease to exist.

## Article VI

1. Upon the occurrence of an Event of Default hereunder, Secured Party may, at its option, declare this Agreement to be in default, and at any time thereafter may do any one or more of the following, all of which are hereby authorized by Debtor:

    a. By written notice to Debtor accelerate and declare the entire unpaid principal and interest due under the Note and all other Obligations, immediately due and payable, without presentment, demand or protest of any kind, all of which Debtor hereby waives. Following such notice of acceleration, all amounts payable to Secured Party hereunder shall bear interest at 1-1/2% per month.

    b. Institute proceedings against Debtor for the collection of all amounts due under the Note and all other Obligations, provided that except as otherwise set forth in Section 5 of Article II, Debtor shall not be liable on a recourse basis for the payment of the principal and interest due under the Note.

    c. Exercise any and all rights and remedies of a secured party under the Uniform Commercial Code in effect in the State of Delaware from time to time or any other applicable State and in addition to those rights, at its sole discretion in the event of a default under the Contract, require Debtor (at Debtor's sole expense) to forward promptly any or all of the Equipment to Secured Party at such location as shall be reasonably required by Secured Party, or enter upon the premises where any such Equipment is located (without obligation for rent) and take immediate possession of and remove the Equipment by summary proceedings or otherwise, all without liability from Secured Party to Debtor for or by reason of such entry or taking possession, whether for the restoration of damage to property caused by taking or otherwise, and exercise such other rights and remedies that Secured Party has under the Contract and any Guaranty (subject to the Customer's right of quiet enjoyment).

    d. Sell, lease or otherwise dispose of the Collateral at public or private sale or otherwise at such price as it may deem best, for cash, credit or otherwise (with the right of Secured Party to purchase) and apply the proceeds:

        First: To payment of all expenses and charges, including the expenses of any sale, lease of other disposition, the expenses of taking, attorneys' fees, court costs and other expenses incurred or advances made by Secured Party in the protection of its rights or the pursuance of its remedies, and to provide adequate indemnity to Secured Party against all taxes and liens which by law have, or may have, priority over the rights of Secured Party to the monies so received by Secured Party;

        Second: To the payment to Secured Party of all unpaid principal and interest due under the Note;

        Third: To the payment to Secured Party of all other Obligations; and

        Fourth: To the payment of any surplus thereafter remaining to Debtor or to whosoever may be entitled thereto.

    Except as limited by Section 5 of Article II, Debtor will remain liable for any deficiency remaining after any disposition of the Collateral and will pay such deficiency forthwith to Secured Party.

    e. Secured Party may exercise any other right or remedy which may be available to it under this Agreement, the Note or applicable law, or proceed by appropriate court action to enforce the terms hereof or to recover damages for the breach thereof or to rescind this Agreement in whole or in part. The exercise by Secured Party of any remedies set forth herein shall be subject to the unqualified right of Customer, conditioned upon

the Customer performing all of the covenants and conditions of the Contract, peaceably and quietly to hold, possess and use the Equipment during the term of the Contract subject to the terms and conditions hereof.

2. Debtor shall be and remain liable for any and all unpaid additional sums due hereunder or under the Note, before, after or during the exercise of any of the foregoing remedies; for all reasonable legal fees and other reasonable costs and expenses incurred by reason of any default or of the exercise of Secured Party's remedies with respect thereto. No remedy referred to in this Article is intended to be exclusive, but each shall be cumulative, and shall be in addition to any other remedy referred to above or otherwise available at law or in equity. Debtor hereby waives any and all existing or future claims to any offset against the sums due hereunder or under the Note and agrees to make the payments regardless of any offset or claim which may be asserted by Debtor or on its behalf in connection with the Note or this Agreement.

3. No delay or omission by Secured Party in insisting upon the strict observance or performance of any provision of the Note or this Agreement, or in exercising any right or remedy, shall be construed as a waiver or relinquishment by Secured Party of such provision, nor shall it impair such right or remedy. Every right and remedy may be exercised by Secured Party from time to time and as often as deemed expedient.

### Article VII

### Perfect Payment

1. This Article VII applies only to Specifications that state that Debtor will remit Payments to Secured Party on a perfect payment basis. For each such Specification, Debtor shall remit all Payments and other amounts collected under or with respect to the Contract ("**Collections**") to Secured Party on the first Remittance Date (as hereafter defined) to occur after such funds have been identified to the Contract. Each remittance shall be made by ACH or wire transfer of immediately available federal funds in accordance with wiring instructions provided by Secured Party in writing to Debtor. As used herein, a "**Remittance Date**" shall be the first day of each month or, if such day is not a business day, then the next business day.

2. On each Remittance Date, Debtor will deposit to Secured Party's account an aggregate amount equal to all Payments due on or before the first calendar day of the month in which the applicable Remittance Date occurs, whether or not such Payments have been received by Debtor from the Customer, subject to the following:

   a. Debtor will not be required to deposit the amount of any Payment to Secured Party's account if Debtor in good faith believes that the Customer will fail to do so, either as a result of its inability to pay or for any other reason, known or unknown, and whether or not lawful or justified;

   b. the portion of any such deposit in excess of Collections actually received by Debtor prior to such deposit with respect to such Payment, shall hereinafter be referred to as a "**Debtor Advance**";

   c. any Debtor Advance hereunder will be made for administrative convenience only, and shall in no way confer upon Debtor any rights of ownership or other interest in any Payment;

   d. if Debtor subsequently receives Collections with respect to any Payment for which a Debtor Advance was previously made, Debtor will be entitled to deposit such Collections for its own account in lieu of repayment by Secured Party of such Debtor Advance, and to deposit and retain for its benefit any late charges paid or payable by the Customer in connection therewith; and

   e. if Debtor does not collect a Collection from Customer, and if Debtor has already made a Debtor Advance with respect thereto, Debtor may give Secured Party written notice thereof within the same calendar month of remittance of such Debtor Advance and may cease remitting amounts invoiced for subsequent months but not collected from Customer. After giving such notice, Debtor may also elect to recoup from Secured Party any Debtor Advance made by Debtor during such calendar month but for which Debtor has not collected a corresponding Collection, provided that a written notice of the election to recoup such Debtor

Advance must be received by Secured Party at least five (5) business days prior to the end of the calendar month in which such Debtor Advance was made.

3.  To the extent that any funds collected by Debtor and remitted to Secured Party are later determined to be "Not Sufficient Funds", or are otherwise uncollectible, such remittance shall be reimbursed by Secured Party to Debtor within ten (10) business days of notice thereof from Debtor. If at any time any amounts received or collected by Debtor in respect of a Contract must be returned to the Customer or paid to any other person or entity pursuant to any federal or state insolvency law, then notwithstanding any other provision of this Agreement, Secured Party will, not later than ten (10) business days following receipt of Debtor's written demand and reasonable documentation of the basis therefor, repay any portion thereof that Debtor shall have remitted to Secured Party (whether pursuant to an Debtor Advance or otherwise).

4.  Debtor shall provide such reporting to Secured Party as is reasonably requested by Secured Party, including without limitation a monthly accounts receivable aging report with respect to each Contract.

### Article VIII

### Miscellaneous

1.  Debtor may prepay the Note in whole or in part, at any time, upon payment of a prepayment fee equal to the present value of the remaining payments (or portion thereof relating to the prepaid amount) due or that otherwise would be due under the Note discounted at the Discount Rate set forth in the Specification minus 200 basis points ("**Prepayment Fee**").

2.  This Agreement, the Note and all other related instruments and documents and the rights and obligations of the parties hereunder and thereunder shall, in all respects, be governed by and construed in accordance with the internal laws of the State of New York (exclusive of choice of law principles), including all matters of construction, validity and performance, regardless of the location of the Equipment. Each of the parties hereby consents to the jurisdiction of any local or state court within New York, New York, and the United States District Court for the Southern District of New York and waives any objection which it may have based on improper venue or forum non conveniens to the conduct of any proceeding in any such court.

3.  All notices (excluding billings and other communications in the ordinary course of business) hereunder shall be in writing, and shall be deemed given at the time of personal delivery or on the first business day after receipt if by registered or certified mail, return receipt requested, addressed to the other party at its respective address stated herein or at such other address as such party shall from time to time designate in a writing to the other party sent in accordance with this paragraph. Notices shall be effective if delivered by email to a party's designee and manually acknowledged by such designee.

4.  This Agreement shall inure to the benefit of Secured Party, its successors and assigns and shall be binding upon the Debtor, its successors and assigns. This Agreement and the obligations and covenants made herein may not be assigned by Debtor without the prior written consent of Secured Party.

5.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and shall not be amended or altered in any manner except by a document in writing executed by both parties.

6.  All representations, warranties and covenants of Debtor contained herein or made pursuant hereto shall survive closing and continue throughout the term hereof and until the Note and all other Obligations shall be paid in full.

7.  Any provision of this Agreement or of any related instrument or document executed pursuant hereto which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or thereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, Debtor hereby waives any provision of law which renders any provision hereof or thereof prohibited or unenforceable in any respect.

8. Except as provided in this paragraph, Secured Party and Debtor agree that all disputes between them arising out of, connected with, related to, or incidental to the relationship established between them in connection with this Agreement, whether arising in contract, tort, equity, or otherwise, shall be resolved only by state or federal courts located in the Southern Federal District of New York. Debtor waives in all disputes any objection that it may have to the location of the court considering the dispute. Debtor agrees that the Secured Party shall have the right to proceed against Debtor or its property in a court in any location necessary to enable the Secured Party to obtain a judgment against the Debtor or to realize on the Collateral or any other security for the Obligations, or to enforce a judgment or other court order entered in favor of Secured Party. Debtor waives any objection that it may have to the location of the court in which Secured Party has commenced a proceeding described in this paragraph.

9. To the extent that Debtor, any Customer or other Person makes a payment or payments to Secured Party in connection with the Loan or Secured Party receives any payment or proceeds of the Collateral for Debtor's benefit, which payment(s) or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy act, state or federal law, common law or equitable cause, then, to the extent of such payment(s) or proceeds received, the Obligations or part thereof intended to be satisfied shall automatically be reinstated as of the date of such invalidation, declaration, set aside or repayment, and shall continue in full force and effect as if such payment(s) or proceeds had not been received by Secured Party.

10. This Agreement, the Note and any and all ancillary documents may be executed manually, electronically and/or digitally in counterparts, and each such executed counterpart, including any photocopy, pdf or printed electronic image thereof, shall be deemed an original of the agreement, and all such counterparts will together constitute the same agreement.

11. The term "Person" as used herein means and includes any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, sole proprietorship, association, trust, unincorporated association, joint stock company, government, institution, municipality, political subdivision or agency, or other entity of whatever nature.

12. EACH OF THE PARTIES WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT OR THE NOTE, ANY RIGHTS OR LIABILITIES HEREUNDER OR THEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR LIABILITIES. Except as prohibited by law, each of the parties waives any right which it may have to claim or recover in any litigation referred to in the preceding sentence any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages. Debtor acknowledges that, in entering into this Agreement and the other loan documents to which Secured Party is a party, Secured Party is relying upon, among other things, the waivers and certifications contained in this paragraph.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year above written.

**Debtor:**

Insight Investments, LLC

By: _____

Name: Christopher M. Czaja

Title: President

**Secured Party:**

Stonebriar Commercial Finance LLC

By: _____

Name:

Title:

**MARK GIBSON**
**VP CAPITAL MARKETS**

## Exhibit 1

## Form of Specification

### Specification

THIS SPECIFICATION is executed as of _____, 20___ (the "**Effective Date**") pursuant to that certain Master Non-Recourse Security Agreement and Assignment dated as of _____, 20___ (the "**Agreement**"), by and between _____ ("**Debtor**") and Stonebriar Commercial Finance LLC ("**Secured Party**"), which Agreement is incorporated herein by reference. This Specification shall control in the event of any conflict between the Agreement and this Specification. Capitalized not defined herein have the meanings given them in the Agreement.

The Contract to which this Specification pertains is described below. The Loan amount is $_____. The Discount Rate is _____%.

Secured Party shall pay the Loan amount to Debtor on the Funding Date set forth below.

1.   Funding Date: _____

2.   Customer: _____

3.   Contract: _____ [insert contract description – e.g., Lease Schedule No. 1234 between Customer and Debtor]

4.   Guarantor(s): None

5.   Security Deposit: None

6.   Advance Payments: None

7.   Initial Contract Term: _____ months

8.   Contract Commencement Date: _____

9.   Contract Payments:

   a.   Number of Payments remaining as of Funding Date: _____

   b.   Payment frequency: _____

   c.   Amount of each Payment: _____

   d.   Payment Due Dates: _____

10.  Equipment Description: See Contract Exhibit(s) *[or list below]*

11.  Equipment Location: See Contract Exhibit(s) *[or list below]*

12.  Contract Documents: See Schedule A hereto *[List all Contract Documents for each Contract]*

13.  Customer Remittance: Debtor shall direct Customer to remit all Payments to _____ [Insert "Secured Party" or "_____ as paying agent for Secured Party" or "Debtor"].

14.  Perfect Pay: This Specification is NOT subject to Perfect Payment pursuant to Article VII of the Agreement. [Modify as needed]

15.  [Notice of Assignment: This is a non-notification assignment. Secured Party shall not disclose the assignment of the Contract to Secured Party unless a default shall have occurred under this Specification or the Contract.] [Remove if the assignment is with notice.]

16.  Additional Terms: NONE

IN WITNESS WHEREOF, the parties hereto have caused this Specification to be duly executed as of the day and year above written.

**Debtor:**                                        **Secured Party:**

Insight Investments, LLC                           Stonebriar Commercial Finance LLC


By: _____                By: _____

Name: _____                Name: _____

Title: _____                Title: _____

**260**

## SCHEDULE A TO SPECIFICATION

Attached to and made part of Specification No. __ dated _____, 20__ between Stonebriar Commercial Finance LLC and Insight Investments, LLC.

1.  [Master Lease Agreement] dated _____ between Customer and _____.

2.  [Schedule No. ___] to [Master Lease Agreement]

3.  [Certificate of Acceptance] dated _____, 20__

4.  [Notice of Assignment] dated _____, 20__

5.  [Landlord Waiver] dated _____, 20__

6.  Certificate of Insurance dated _____, 20__

7.  Guaranty from [_____] dated _____, 20__

8.  [Identify other Contract Documents]

{00060045.DOCX 1}

**261**

Exhibit 2

## Form of Note

### PROMISSORY NOTE

$_____                                          _____, 20___

                                                          _____City, State_____

FOR VALUE RECEIVED, the undersigned, _____ a(n)_____ [corporation] ("**Borrower**"), hereby promises to pay to the order of Stonebriar Commercial Finance LLC, located at _____ ("**SCF**"), the principal sum of _____($_____) Dollars, together with interest on the unpaid balance thereof from the date of the loan evidenced hereby until paid in full at the rate of ____ percent (___%) per annum ("**Interest Rate**") (computed on the basis of a 360 day year of 12 consecutive 30-day months for the number of days actually elapsed). Interest after maturity or default shall accrue at the default rate provided for in the Specification (defined below).

The principal of and interest on this Note shall be payable in ___ successive monthly installments of principal and interest in the sum of $_____ each, commencing on _____, 20__ and continuing on the _____ day of each calendar month thereafter, ending with the payment due on _____, 20__.

All payments of principal of and interest on this Note shall be payable at the principal office of SCF set forth above, in lawful money of the United States of America. Each installment payment, when paid, shall be applied first to accrued and unpaid interest and the balance shall be applied to principal. Said installment payments shall be made to the holder of this Note without presentation of this Note for notation of such payments.

This Note secured by and is made subject and pursuant to Specification No. ____ of even date herewith between Borrower as debtor and SCF as secured party, incorporating by reference that certain Master Non-Recourse Security Agreement and assignment between Borrower and SCF (together, the "**Security Agreement**"), pursuant to which Borrower has collaterally assigned and granted to SCF a first priority security interest in certain Collateral as defined therein. This Note may be declared due prior to its maturity date upon the terms and in the manner provided for in the Security Agreement.

Borrower may prepay this Note in whole or in part, at any time, upon payment of a prepayment fee equal to the present value of the remaining payments (or portion thereof relating to the prepaid amount) due or that would otherwise be due hereunder discounted at Interest Rate minus 200 basis points ("**Prepayment Fee**").

**Except as set forth in the Security Agreement, this Note is a non-recourse obligation of Borrower and Borrower shall not be personally liable to pay principal or interest due and to become due hereunder; provided, however that if the Note is prepaid, Debtor shall be obligated on a full-recourse basis to pay the Prepayment Fee to Secured Party**. The foregoing sentence shall not limit, restrict or impair the right of SCF to proceed against Borrower for damages (including costs and reasonable attorneys' fees) incurred by the SCF resulting from: (a) the breach of any covenant of Borrower under the Security Agreement, or (b) any representation or warranty of Borrower contained in the Security Agreement being incomplete, incorrect or misleading in any material respect when made.

Borrower waives presentment and demand for payment, notice of dishonor, protest and notice of protest of this Note. The provisions of this Note shall be binding upon any successor of Borrower and shall inure to the benefit of SCF and any subsequent holder thereof. This Note may be amended, modified, changed, except only by an instrument in writing, signed by the party against whom enforcement of any amendment, modification, change, or discharge is sought.

This Note shall in all respects be governed by, and construed in accordance with, the laws of the State of New York, including all matters of construction, performance, validity and lawful interest rate. Borrower hereby consents to the jurisdiction of any local or state court within New York, New York, and the United States District Court for the Southern District of New York and waives any objection which Borrower may have based on improper venue or forum non conveniens to the conduct of any proceeding in any such court. BORROWER WAIVES, TO THE EXTENT PERMITTED BY LAW, TRIAL BY JURY OF ALL DISPUTES BETWEEN BORROWER AND SCF ARISING OUT OF OR RELATING TO THIS NOTE.

Borrower: [Template – do not sign]

By: _____

Name: _____

Title: _____

**263**

## CERTIFICATE OF INCUMBENCY

The undersigned, _____, Secretary of _____, a [corporation] (hereinafter "Company"), hereby certifies as follow:

1.      That the undersigned is duly elected, qualified and Secretary of the Company and is charged with maintaining the records, minutes and seal of Company.

2.      That pursuant to the Company's By-Laws, as amended, the following named person(s) was (were) properly designated and appointed to the office(s) indicated below and that said person continues to hold the office at this time.

| NAME | SIGNATURE | TITLE |
|------|-----------|-------|
|      |           |       |
|      |           |       |

3.      That pursuant to the Company's By-Laws, as amended, (1) each person named above has been properly designated and appointed to the office indicated above, and such person continues to hold the office at this time, and the signature appearing opposite such person's name is the genuine signature of such authorized person; and (2) each such person designated to serve in the above-entitled capacity has been given sufficient authority to act on behalf of, and to bind the Company with respect to the execution and delivery of that certain Master Non-Recourse Security Agreement and Assignment dated on or about _____, 20__ between Company and Stonebriar Commercial Finance LLC, such specifications and promissory notes as may from time to time be executed pursuant thereto, together with all related schedules, exhibits, certificates, instruments and documents as they may be amended from time to time, and each such document will constitute a valid, legal, binding and enforceable obligation of the Company upon execution by each such person.

4.      That pursuant to the Company's By-Laws, as amended, the undersigned has the power and authority to execute this certificate on behalf of the Company and that he has executed this certificate this _____ day of _____, 20__.

_____
Secretary

# App'x 4

## (July 27 Specification)

## Specification

THIS SPECIFICATION is executed as of July 27, 2022 (the "**Effective Date**") pursuant to that certain Master Non-Recourse Security Agreement and Assignment dated as of April 11, 2022 (the "**Agreement**"), by and between Insight Investments, LLC ("**Debtor**") and Stonebriar Commercial Finance LLC. a Delaware corporation ("**Secured Party**"), which Agreement is incorporated herein by reference. This Specification shall control in the event of any conflict between the Agreement and this Specification. Capitalized not defined herein have the meanings given them in the Agreement.

The Contract to which this Specification pertains is described below. The Loan amount is $5,010,998.00. The Discount Rate is 9.88%.

Secured Party shall pay the Loan amount to Debtor on the Funding Date set forth below.

1.  Funding Date: July 27, 2022

2.  Customer: Legacy Sports USA, LLC and Legacy Cares, Inc.

3.  Contract: (Lease Schedule No.2) Dated June 30, 2022 between Customer and Debtor

4.  Guarantor(s): None

5.  Security Deposit: None

6.  Advance Payments: None

7.  Initial Contract Term: 48 Months

8.  Contract Commencement Date: July 1, 2022

9.  Contract Payments:

    a.  Number of Payments remaining as of Funding Date: 47 Months (assigning 43)

    b.  Payment frequency: Monthly

    c.  Amount of each Payment: $139,195.55 (42) followed by (1) $90,518.25

    d.  Payment Due Date: August 10, 2022 and on the 10th of the month thereafter through February 10, 2026

10. Equipment Description: See Contract Exhibit(s)

11. Equipment Location: See Contract Exhibit(s)

12. Contract Documents: See Schedule A hereto

13. Customer Remittance: Debtor shall direct Customer to remit all Payments to Fifth Third Bank, National Association Paying Agent

14. Perfect Pay: This Specification is NOT subject to Perfect Payment pursuant to Article VII of the Agreement.

15. Notice of Assignment: See Contract

16. Additional Terms: NONE

IN WITNESS WHEREOF, the parties hereto have caused this Specification to be duly executed as of the day and year above written.

**Debtor:**

Insight Investments, LLC

By: _____

Name: _____ Christopher M. Czaja _____
President

Title: _____

**Secured Party:**

Stonebriar Commercial Finance LLC

By: _____

Name: _____ Dirk N. Stock _____
Vice President

Title: _____

## SCHEDULE A TO SPECIFICATION

Attached to and made part of Specification No. 1 dated July 27, 2022, between Stonebriar Commercial Finance LLC and Insight Investments, LLC.

1. Master Lease Agreement No. 9586 dated September 13, 2021, between Customer and Insight Investments, LLC.

2. Schedule No. 2 to Master Lease Agreement 9586

3. Certificate of Acceptance dated June 7, 2022

4. Notice of Assignment dated July 7, 2022

5. Landlord Waiver dated June 30, 2022

6. Certificate of Insurance dated Liability 10-12-2022 & Property 01-15-23

7. Guaranty from n/a

8. None

# App'x 5

## (Landlord Waiver)

**COLLATERAL ACCESS AGREEMENT**
(Landlord)

This Collateral Access Agreement (this "**Agreement**") is made and effective as of this 30th day of June, 2022 by PACIFIC PROVING, LLC ("**Landlord**"), for the benefit of Legacy Sports USA, LLC ("Lessee or Co-Lessee") and Legacy Cares, Inc. ("Lessee or Co-Lessee") (each, and collectively, an "**Obligor**") and Insight Investments, LLC (the "**Company**").

   A.  Landlord and Obligor are parties to that certain real property lease agreement ("**Premises Lease**") pertaining to certain premises owned by Landlord more particularly described on Schedule A attached hereto and hereby made a part hereof (the "**Premises**"); and

   B.  The Company has been asked by Obligor to extend certain secured financing or lease accommodations to Obligor from time to time covering certain fixtures, furniture and equipment that is or will be located in or about the Premises; pursuant to that certain Schedule No. 2 to Master Lease Agreement No. 9586 dated September 13, 2021 (the "Lease") between the Company and Obligor; and

   C.  The Company requires this Agreement as a condition precedent to extending such accommodations to Obligor, and Landlord desires to provide the consents and waivers set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord agrees for the benefit of Obligor and the Company as follows:

   1.  Landlord hereby waives and relinquishes to the Company, its successors and assigns, any and all liens, security interests, rights, claims and demands of every kind that it may now or hereafter have with respect to the equipment described in Schedule B attached hereto and incorporated herein for all purposes (the "**Equipment**"), including without limitation any rights to seize, hold, levy upon, take possession of, sell or otherwise transfer or dispose of the Equipment, whether such Equipment constitutes fixtures or personal property. The Equipment (i) shall remain personal property notwithstanding the manner or mode of its attachment to, or installation on, the Premises; (ii) shall not become fixtures; and (iii) shall not be moved without the Company's express written consent. The Equipment may be kept, installed, maintained, used and operated on the Premises, and the Company's interest in the Equipment shall be superior to any interest which Landlord may now have, or hereafter may acquire, in the Equipment by operation of law or otherwise, up to the term of the Lease or any extension thereof.

   2.  Landlord agrees that it will allow the Company and the Company's agents, assigns or designees reasonable access to the Premises to inspect the Equipment from time to time, and in the event of Obligor's default of Obligor's obligations to the Company, to show the Equipment to potential purchasers, and/or to maintain the Equipment on the Premises with full right of access thereto, for up to ninety (90) days after notice of default to Obligor without charge for Premises rent, storage charge or maintenance by the Landlord, and/or to remove the Equipment from the Premises. The Company will repair any damage to the Premises caused by the gross negligence or willful misconduct of the Company or its agents in connection with the removal of the Equipment.

   3.  Landlord agrees that prior terminating or exercising remedies under the Premises Lease for any reason (including, e.g., following a default by Obligor under the Premises Lease), Landlord will use reasonable efforts to notify the Company in writing. In any event, Landlord agrees to promptly notify the Company in writing in the event Landlord has retaken possession of the Premises. Any such notice shall be addressed to Insight Investments, LLC, 611 Anton Blvd., Suite 700, Costa Mesa, California 92626, Attention: General Counsel or such other address as is provided by the Company to Landlord in writing for such purpose after the date hereof.

   4.  This instrument and all covenants, terms and provisions hereof shall bind and inure to the benefit of the respective heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto as well as to any purchaser(s) or mortgagee(s) of Landlord's interest in the Premises.

   5.  This Agreement supersedes all prior and contemporaneous discussions and correspondence, if any, regarding the subject matter hereof, and it may be amended, modified, or supplemented only by a further written agreement executed by Landlord and the Company. If any provision of this Agreement shall be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions shall not in any way be affected or impaired. This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

6.        This Agreement will be governed by and interpreted in accordance with the laws of the State of New York, without regard to such state's choice of law or conflict of law provisions. **The parties hereto hereby waive the right to a jury trial in any dispute regarding this Agreement or the subject matter hereof.**

[signature page follows]

EXECUTED AND EFFECTIVE as of the date first written above.

[EXACT LEGAL NAME OF LANDLORD]

By: _____

By its Duly Authorized Representative

Name: _____PACIFIC PROVING, LLC_____

Title: _____

SWORN TO AND SUBSCRIBED before me this 15 day of _November_ 20 22

[seal]

_____
Notary Public in and for the
State of

LISA CHRISTINA BULLINGTON
Notary Public, State of Arizona
Maricopa County
Commission # 561714
My Commission Expires
April 12, 2023

# SCHEDULE A

## Equipment Location Address and Legal Description

Premises Address: 1 Legacy Drive, Mesa, AZ 85212

Premises Legal Description:

[Legal Description]

# SCHEDULE B

## Equipment Description

[

| | | | | |
|---|---|---|---|---|
| Equipment Located At: | Legacy Sports USA, LLC & Legacy Cares, Inc. as Co-Lessees 1 Legacy Drive Mesa AZ, 85212 | | | |

| Qty | Model | Manufacturer | Description | Serial Number |
|---|---|---|---|---|
| 3 | MWT18X4 | Milnor | Milnor MWT18X4 45 LB WASHER/EXTRACTOR EP PLUS, SINGLE MOTOR INVERTER DRIVE, 208-240/60/1,3 P | 210119654, 210119655, 210119653 |
| 4 | Speed Queen | Speed Queen | Speed Queen Speed Queen 55 LB DRYER, OPL, 100-120 | 2107601188, 2107601189 2108600253, 2107601191 |
| 3 | AF-1-S | Energenics Corporation | Energenics Corporation AF-1-S DUCT MOUNTED LINT COLLECTOR | |
| 1 | UTILITWIN TUB | E.L. Mustee & Sons | E L. Mustee & Sons UTILITWIN TUB UTILITWIN LAUNDRY TUB DUAL SINK, DEEP BOWL | |
| 1 | BRAD-LCES220 | Bradley Corp | Bradley Corp BRAD-LCES220 EYEWASH STATION | |
| 2 | METRO WIRE SHELVING | Metro | Metro METRO WIRE SHELVING WIRE STORAGE SHELVING, 36"W X 24" D X 74" H | |
| 1 | 630EF | Midwest Folding | Midwest Folding 630EF 630EF Rectangular Plywood Core FoldingTable - 30X72X30 | |
| 1 | | - | - Installation | |
| 4 | | - | - Freight | |
| 2 | InBody 570 | InBody | InBody InBody 570 Body composition analyzer, 45 seconds test duration, 5, 50, 500 kHz, USB Thumb Drive_IB, Printer HP M102w, Results Sheet IB570, InBody Tissue, Warranty | |
| 2 | | - | - Shipping & Handling Fee | |
| 1 | | - | - SubContractor - Network Hardware Installation | |
| 1 | | - | - Network Infrastructure - Material Installation | |
| 1 | | - | - Network Infrastructure - Labor | |
| 1 | | - | - CCTV & Access Control - Material | |
| 1 | | - | - CCTV & Access Control - Labor | |
| 1 | | - | - CO-004 - Redundancy Core Network Switch | |
| 1 | | - | - CO-007 - Wifi Part 1 services | |
| 1 | | - | - CO-009 - Wifi Part 2 services | |
| 1 | | - | - CO-012 - Wifi Part 3 services | |
| 1 | | - | - CO-017 - Ruckus Stacking Cables | |
| 1 | CST-1600-10 | Fair-Play | Fair-Play CST-1600-10 Court Side Table 10' with BB-1600-4 Face and Functionality, no control included (Quantity of 10) | |

| | | | |
|---|---|---|---|
| 50 | MP-60-0213 | Fair-Play | Fair-Play MP-60-0213 Scoreboard control - no case. Wireless battery operated |
| 1 | CST-1600-10 | Fair-Play | Fair-Play CST-1600-10 Court Side Table, 10' with BB-1600-4 Face and Functionality, no control included (Quantity of 20) |
| 57 | PM-24-6UP-G | Adaptive Technologies | Adaptive Technologies PM-24-6UP-G Polestar Outdoor Galvanized Uniframe For 6+ Inch Diameter Poles. |
| 55 | PM-BAND-90 | Adaptive Technologies | Adaptive Technologies PM-BAND-90 Band Kit For 20-28 Inch Diameter Poles With 2 Straps And 2 Clamp Assemblies |
| 62 | XT1144 | BrightSign | BrightSign XT1144 EXPANDED I/O PLAYER - H.2654/H.265 4K & FULL HD VIDEO, DOLBY VISION AND HDR10+, 4K FULL RES 4K UPSCALING AND DUAL DECODING OF TWO 4KP60 VIDEOS SIMULTANEOUSLY. HTML5 RENDERING, POE+ GPIO IR ANALOG AUDIO, DUAL USB A & C, LIVE TV PLAYBACK EVEN HDCP CONTENT. |
| 24 | 2445 | C2G | C2G 2445 1.5ft Velocitya DB9 Female to 3.5mm Male Adapter Cable |
| 115 | LTM1U | Chief | Chief LTM1U Large Height Micro-Adjustable Tilt Flat Panel Mount, Universal. |
| 30 | CONTROL 47C/T | JBL | JBL CONTROL 47C/T 6.5-INCH 2-WAY 70.7V WIDE-COVERAGE IN-CEILING LOUDSPEAKER (PRICED AS EACHES) SOLD IN PAIRS |
| 122 | CONTROL 67 HC/T | JBL | JBL CONTROL 67 HC/T 6.5-INCH NARROW-COVERAGE HIGH-CEILING 8-OHM/70V PENDANT LOUDSPEAKER W/ 15 FT. SUSPENSION AND SAFETY CABLE, BLACK. (PRICED AS EACHES) SOLD IN PAIRS |
| 13 | PD-915R | Middle Atlantic | Middle Atlantic PD-915R 9 OUTLET 15 AMP RACK MOUNT POWER STRIP WITH SURGE PROTECTION. |
| 2 | RFR-1628BR | Middle Atlantic | Middle Atlantic RFR-1628BR 16RU, 28-INCH DEEP, MOBILE REFERENCE FURNITURE, RACK WITH PLEXIGLAS DOOR & 3-INCH CASTERS. BLACK CASCADE FINISH. |
| 2 | RFR-ERRK-16 | Middle Atlantic | Middle Atlantic RFR-ERRK-16 16RU RACK RAIL KIT FOR RFR-SERIES RACKS SOLD AS PAIR. |
| 2 | RM-KB-LCD17HD | Middle Atlantic | Middle Atlantic RM-KB-LCD17HD HIGH DEFINITION RACKMOUNT |

| | | | | |
|---|---|---|---|---|
| | | | CONSOLE WITH 17-INCH 1080P DISPLAY, KEYBOARD AND TOUCHPAD, 1RU. | |
| 21 | U1V | Middle Atlantic | Middle Atlantic U1V 1RU VENTED RACKSHELF, 10.4" DEEP | |
| 2 | U3V | Middle Atlantic | Middle Atlantic U3V 3 SPACE (5 1/4") VENTED RACKSHELF | |
| 1 | DC2000RTX1 | Orion Images | Orion Images DC2000RTX1 ONLINE RTX 2000VA TRUE ONLINE DOUBLE CONVERSION UPS RATED AT 2000VA/ 1600 WATTS. FLEXIBLE RACK/TOWER DESIGN, INCLUDES TRUE SINE WAVE OUTPUT, (8) 5-20R RECEPTACLES, 5-20P INPUT PLUG, OPTIONAL EXTENDED BATTERY PACKS, AND OPTIONAL SNMP AND RELAY CARDS FOR NETWORK MONITORING. | 83212106700068 |
| 1 | PT-RZ790WU7 | Panasonic | Panasonic PT-RZ790WU7 7000 LUMENS WUXGA 1-CHIP DLP LASER PROJECTOR WITH 1 HDBASET, 1 HDMI, 1 DVI-D, 1 HD-15, 1 RGBHV & 1 HD-SDI VIDEO INPUT. LAN PORT. RS-232 CONTROLLABLE WHITE CABINET. 1.71-2.41:1 T:W | GB1530050 |
| 30 | XHB553 | Peerless | Peerless XHB553 (1) 55" FHD (1920 x 1080) Screen Size Monitor | K13LA61110117, K13LA61110120, K13LA61110001, K13LA61110002, K13LA61110003, K13LA61110004, K13LA61110021, K13LA61110022, K13LA61110023, K13LA61110024, K13LA61110025, K13LA61110026, K13LA61110027, K13LA61110028, K13LA61110033, K13LA61110034, K13LA61110035, K13LA61110036, K13LA61110061, K13LA61110062, K13LA61110063, K13LA61110064, K13LA61110071, K13LA61110072, K13LA61110085, K13LA61110086, K13LA61110087, K13LA61110088, K13LA61110095, K13LA61110096 |
| 12 | QUATTROCANALI 2404 DSP+DANTE | Powersoft | Powersoft QUATTROCANALI 2404 DSP+DANTE 4-CHANNEL 2400W FLEXIBLE AMPLIFIER WITH DSP AND DANTE. | 776701, 776704, 776705, 776707, 776709, 776711, 776712, 776715, 776716, 776717, 776718, 776719 |
| 91 | QB65R | Samsung | Samsung QB65R (1) 65" 4K UHD (3840x2160) Screen Size Monitor | 08XVHCZRA02675R, 08XVHCZRA02712T, 08XVHCZRA00481D, 08XVHCZRA00511X, 08XVHCZRA00516Z, 08XVHCZRA02680B, 08XVHCZRA02687H, 08XVHCZRA00524X, 08XVHCZRA00602D, 08XVHCZRA02713L, 08XVHCZRA02704J, 08XVHCZRA02636L, 08XVHCZRA02641D, 08XVHCZRA02652N, 08XVHCZRA02653X, 08XVHCZRA02709N, 08XVHCZRA02660J, 08XVHCZRA02661H, 08XVHCZRA02714V, 08XVHCZRA02717J, 08XVHCZRA02719R, 08XVHCZRA02720A, 08XVHCZRA02662R, 08XVHCZRA02695L, 08XVHCZRA02740F, 08XVHCZRA02744D, |

| Qty | Model | Mfr | Description | Serial Numbers |
|---|---|---|---|---|
| | | | | 08XVHCZRA02747Y, 08XVHCZRA02701F, 08XVHCZRA02706R, 08XVHCZRA02758P, 08XVHCZRA02759A, 08XVHCZRA02711B, 08XVHCZRA00465W,08XVHCZRA02715W, 08XVHCZRA00473K, 08XVHCZRA00474B, 08XVHCZRA02750J, 08XVHCZRA02756X, 08XVHCZRA00513P, 08XVHCZRA00514A, 08XVHCZRA00517K, 08XVHCZRA00521F, 08XVHCZRA02748Z, 08XVHCZRA02749K, 08XVHCZRA02753F, 08XVHCZRA02757D, 08XVHCZRA00477V, 08XVHCZRA00522E, 08XVHCZRA00523N, 08XVHCZRA00526P, 08XVHCZRA00528Y, 08XVHCZRA00530M, 08XVHCZRA02629R, 08XVHCZRA02632Z, 08XVHCZRA02634B, 08XVHCZRA02637V, 08XVHCZRA02638W, 08XVHCZRA02639M, 08XVHCZRA02640X, 08XVHCZRA02642P, 08XVHCZRA02643A, 08XVHCZRA02645Z, 08XVHCZRA02655P, 08XVHCZRA02664E, 08XVHCZRA02666X, 08XVHCZRA02670V, 08XVHCZRA02671W, 08XVHCZRA02672M, 08XVHCZRA02673J, 08XVHCZRA02693B, 08XVHCZRA02697W, 08XVHCZRA02698M, 08XVHCZRA02699J, 08XVHCZRA02700L, 08XVHCZRA02702W, 08XVHCZRA02703M, 08XVHCZRA02705H, 08XVHCZRA02677E, 08XVHCZRA02678N, 08XVHCZRA02681T, 08XVHCZRA02751H, 08XVHCZRA02667D, 08XVHCZRA02674H, 08XVHCZRA02708E, 08XVHCZRA00462T, 08XVHCZRA00467J, 08XVHCZRA00470A, 06XVHCZRA02701V, 08XVHCZRA00471Y, 06XVHCZRA00472Z, 08XVHCZRA00475T |
| 5 | QB65R-B | Samsung | Samsung QB65R-B (1) 65" 4K UHD (3840x2160) Screen Size Monitor | 0DBJHCZRB03692K, 0DBJHCZRB03709Y, 0DBJHCZRB03711L, 0DBJHCZRB03701N, 0DBJHCZRB01668M |
| 7 | QM32R | Samsung | Samsung QM32R (1, 32" (1920 x 1080) Screen Size Monitor | OGX6HNBR700222, OGX6HNBR700313, OGX6HNBR700315, OGX6HNBR700317, OGX6HNBR700319, OGX6HNBR701076, OGX6HNBR701077 |
| 2 | MENU POS ENGINEERING & DESIGN | UCView | UCView MENU POS ENGINEERING & DESIGN MENUS POS INTEGRATION ENGINEERING & DESIGN FOR ALL MENUS. | |
| 1 | SCOREBAORD INTEGRATION | UCView | UCView SCOREBAORD INTEGRATION SCOREBOARD INTEGRATION MODULE (OES INTEGRATION UTILITIES NOT INCLUDED) | |
| 1 | TV GUIDE INTEGRATION | UCView | UCView TV GUIDE INTEGRATION TV GUIDE INTEGRATION (DOES NOT INCLUDE 3RD PARTY CHANNEL FEED SUBSCRIPTION) | |
| 1 | VIEW EDGE VIRTUAL | UCView | UCView VIEW EDGE VIRTUAL DIGITAL SIGNAGE SERVER VM SOFTWARE | |

| | | | | |
|---|---|---|---|---|
| 24 | WATERPROOF ENCLOSURE - 10X7.9X3.1 | Zulkit | Zulkit WATERPROOF ENCLOSURE - 10X7.9X3 1 JUNCTION BOX ABS PLASTIC DUSTPROOF WATERPROOF, IP65 UNIVERSAL ELECTRICAL BOXES PROJECT, ENCLOSURE WHITE 10 X 7.9 X 3.1 INCH. | |
| 1 | | - | - Professional Services | |
| 57 | SC-188-30-SS | Adaptive Technologies | Adaptive Technologies SC-188-30-SS 30-Inch Safety Cable For Use With Pm-Safety-6Down; 3/16` Stainless Steel Wire Rope. | |
| 1 | OCR TERMINAL STRIP + JUMPERS | Amazon | Amazon OCR TERMINAL STRIP + JUMPERS OCR 10 POSITION DOUBLE ROW SCREW TERMINAL STRIP BLOCKS 600V 15A 5-PACK + RED/BLACK PRE-INSULATED TERMINAL BARRIER STRIP 400V 15A 10-PACK | |
| 21 | PM8SUB-B | Atlas Sound | Atlas Sound PM8SUB-B 8 INCH PENDANT MOUNT SUBWOOFER WITH 70.7V-60W TRANSFORMER, BLACK. | |
| 62 | SDHC-32C10-1 | BrightSign | BrightSign SDHC-32C10-1 32Gb Micro SD Class 10 Memory Card | |
| 14 | XD1034 | BrightSign | BrightSign XD1034 BRIGHTSIGN - 4K Advanced HTML5 Interactive Media Player | |
| 12 | 40613 | C2G | C2G 40613 3 FT 3.5MM TO DUAL RCA STEREO AUDIO CABLE | |
| 2 | 56782 | C2G | C2G 56782 3 FT. HIGH SPEED HDMI CABLE. | |
| 8 | 56783 | C2G | C2G 56783 6 FT HIGH SPEED HDMI CABLE | |
| 7 | 56784 | C2G | C2G 56784 10 FT. HIGH SPEED HDMI CABLE. | |
| 1 | CMS006W | Chief | Chief CMS006W FIXED PIPE - 6-INCHES, WHITE. | |
| 1 | CMS492CP2 | Chief | Chief CMS492CP2 2' X 2' ABOVE SUSPENDED CEILING STORAGE BOX AND COLUMN DROP WITH 2-GANG FILTER & SURGE. | |
| 2 | FSB018BLK | Chief | Chief FSB018BLK SMALL FLAT PANEL TABLE STAND VESA 75X75 AND 100X100 | |
| 30 | LSM1U | Chief | Chief LSM1U Large Fusion Micro-Adjustable Fixed Wall Display Mount. | |
| 2 | DGE-100 | Crestron | Crestron DGE-100 DIGITAL GRAPHICS ENGINE 100 WITH HDMI INPUT AND LOOP-THROUGH. USB AND LAN | 2135JBM03326, 2135JBM00836 |
| 2 | DMPS3-300-C | Crestron | Crestron DMPS3-300-C 3-SERIES DIGITALMEDIA PRESENTATION SYSTEM 300 - MATRIX SWITCHER WITH 2 HDMI | 2013JBH20617, 2020JBH08447 |
| 2 | DM-RMC-4KZ-100-C | Crestron | Crestron DM-RMC-4KZ-100-C DIGITALMEDIA 8G+ 4K60 4:4:4 | 2147JBH15162. 2147JBH15179 |

| | | | HDR RECEIVER & ROOM CONTROLLER 100. | |
|---|---|---|---|---|
| 1 | FP-G1-B-T | Crestron | Crestron FP-G1-B-T DECORATOR STYLE FACEPLATE, 1-GANG, BLACK TEXTURED. | |
| 4 | MP-WP152-B | Crestron | Crestron MP-WP152-B MEDIA PRESENTATION WALL PLATE WITH HDMI F-F CONNECTION, BLACK. | |
| 2 | PRO4 | Crestron | Crestron PRO4 4-SERIES CONTROL SYSTEM, THREE 4-SERIES CONTROL CARD SLOTS, 6 COM, 8 IR/SERIAL, 8 RELAY, 8 I/O, 4 POE PORTS FOR CONTROL SUBNET, & 1 LAN PORT. FRONT PANEL CONTROL. | |
| 8 | SAROS_ICE8T-W-T-EACH | Crestron | Crestron SAROS_ICE8T-W-T-EACH SAROS EXPRESS 8" 2-WAY IN-CEILING SPEAKER, WHITE TEXTURED, SINGLE (MUST BE ORDERED IN MULTIPLES OF 2) | |
| 2 | TSD-2220-B | Crestron | Crestron TSD-2220-B 21.5 INCH 1080P TOUCH SCREEN DISPLAY FOR USE WITH DGE-100 OR DM-DGE-200-C | 23110732, 23110748 |
| 4 | TSW-570-B-S | Crestron | Crestron TSW-570-B-S 5-INCH WALL MOUNT TOUCH SCREEN, BLACK SMOOTH. REQUIRES POE. INCLUDES TSW-UMB-70 AND TSW-UMB-70-PMK. | 2143JBH01007, 2143JBH01048, 2143JBH01054, 2143JBH01058 |
| 5 | TSW-770-B-S | Crestron | Crestron TSW-770-B-S 7 IN. WALL MOUNT TOUCH SCREEN, BLACK SMOOTH | |
| 1 | TT-100-B-T | Crestron | Crestron TT-100-B-T CONNECT IT PRESENTATION INTERFACE WITH 120V OUTLET, BLACK TEXTURED. | |
| 1 | 140036L | Draper | Draper 140036L ACCESS FIT V 109-INCH DIAGONAL 16:10 MOTORIZED PROJECTION SCREEN | |
| 2 | 60-1763-01 | Extron | Extron 60-1763-01 SME 211 - H.264 STREAMING MEDIA ENCODER. HDMI AND STEREO AUDIO INPUTS. HDMI OUTPUT. LAN AND USB STORAGE PORTS. | A2ETXP6, A2ETXR3 |
| 1 | 60-190-01 - USED | Extron | Extron 60-190-01 - USED RSU 129 - 1RU RACK SHELF KIT, 9.5 DEEP. USED - NO WARRANTY | |
| 2 | EliteDesk 805 G6 SFF | HP | HP EliteDesk 805 G6 SFF (1) AMD Ryzen 7 CPU (1) 16GB RAM (1) 512GB SSD Storage 1 Windows 10 Pro, Radeon Graphics | |
| 12 | CONTROL 29AV-1 | JBL | JBL CONTROL 29AV-1 8-INCH 2-WAY HIGH OUTPUT INDOOR/OUTDOOR LOUDSPEAKER, BLACK. | |
| 12 | MTC-29UB | JBL | JBL MTC-29UB U-BRACKET FOR CONTROL 29AV, BLACK. | |

| | | | | |
|---|---|---|---|---|
| 1 | PSB-1 | JBL | JBL PSB-1 2.0 CHANNEL COMMERCIAL-GRADE SOUNDBAR. | |
| 24 | 75US340C0UD | LG | LG 75US340C0UD (1) 75" UHD (3840 x 2160) Screen Size Monitor | 110RMHR6Y729, 110RMRH6Y726, 110RMYA6Y730, 112RMDZ69874, 110RMAQ6Z064, 112RMEN3K780, 112RMFP3K787, 110RMDZ6Z058, 112RMGC69871, 110RMEN6Z060, 110RMKU6Z061, 110RMMD6Z059 110RMPG6Y680, 110RMUY6Z062, 112RMKU3K781, 112RMLM69872, 112RMMD3K779, 112RMMD69875 112RMNE3K783, 112RMSS69870, 112RMTT3K777, 112RMTT69873, 112RMXX3K786, 112RMZL69869 |
| 3 | I85261-RHIM-RJ-01 | Liberty AV Solutions | Liberty AV Solutions I85261-RHIM-RJ-01 1RU RACK PANEL WITH IMMEDIA LOGO & RJ45 CONNECTION | |
| 10 | EB1 | Middle Atlantic | Middle Atlantic EB1 1RU BLANK PANEL | |
| 2 | EB2 | Middle Atlantic | Middle Atlantic EB2 2RU BLANK PANEL | |
| 57 | P2110-T | RCF | RCF P2110-T WEATHERPROOF 10-INCH COAXIAL TWO-WAY SPEAKER, 90 X 40CMD CONSTANT DIRECTIVITY HORN, 124 DB SPL MAX, 200W RMS. | |
| 13 | DD-BTN44 | RDL | RDL DD-BTN44 Wall-Mounted Bi-Directional Line-Level And Bluetooth Audio Dante Interface, 2-Gang Decora Wall Plate, White. | |
| 68 | EZ-MPA1 | RDL | RDL EZ-MPA1 MICROPHONE PRE-AMPLIFIER WITH BUILT-IN COMPRESSOR, STEREO RCA and 3.5MM UNB | |
| 46 | TX-J2 | RDL | RDL TX-J2 LINE MATCHING TRANSFORMER | |
| 3 | QB50R | Samsung | Samsung QB50R (1) 50" 4K UHD (3840x2160) Screen Size Monitor | 0DBDHCRRB02748L, 0DBDHCRRB02787T, 0DBDHCRRB02791X |
| 34 | QB50R-B | Samsung | Samsung QB50R-B (1) 50" 4K UHD (3840x2160) Screen Size Monitor | 0DBDHCRRB02325F, 0DBDHCRRB02559P, 0DBDHCRRB02590R, 0DBDHCRRB02593Z, 0DBDHCRRB02594T, 0DBDHCRRB02716W, 0DBDHCRRB02595W, 0DBDHCRRB02476A, 0DBDHCRRB02488X, 0DBDHCRRB02504J, 0DBDHCRRB02505F, 0DBDHCRRB02588V, 0DBDHCRRB02589J, 0DBDHCRRB02591N, 0DBDHCRRB02592P 0DBDHCRRB02596H 0DBDHCRRB02597E 0DBDHCRRB02668X 0DBDHCRRB02673H, 0DBDHCRRB02711R, 0DBDHCRRB02712N, 0DBDHCRRB02713P, 0DBDHCRRB02715T, 0DBDHCRRB02718E, 0DBDHCRRB02719D, 0DBDHCRRB02720A, 0DBDHCRRB02726P, 0DBDHCRRB02731F 0DBDHCRRB02706D, 0DBDHCRRB02756J 0DBDHCRRB02759A, 0DBDHCRRB02561B, 0DBDHCRRB02501Y, 0DBDHCRRB02709V |
| 23 | QB55R | Samsung | Samsung QB55R (1) 55 4K UHD (3840x2160) Screen Size Monitor | 07YHHNFR603627, 07YHHNFR603864, 07YHHNFR603995, 07YHHNFR604206, 07YHHNFR604331, 07YHHNFR604326, |

07YHHNFR604332, 07YHHNFR604335,
07YHHNFR604333, 07YHHNFR604352,
07YHHNFR604354, 07YHHNFR604356
07YHHNFR604357, 07YHHNFR604358,
07YHHNFR604355, 07YHHNFR604330,
07YHHNFR603570, 07YHHNFR604353,
08XUHCRRA01411P, 08XUHCRRA01530W,
08XUHCRRA01201W, 08XUHCRRA01252F,
08XUHCRRA01601N

| 30 | MENU BOARD DESIGN | UCView | UCView MENU BOARD DESIGN MENU DESIGN TEMPLATE (MOCKUP AND DESIGN PER CUSTOMER SPEC) | |
|----|----|----|----|----|
| 30 | MENU HTML CONVERSION | UCView | UCView MENU HTML CONVERSION MENU CONVERSION TO DYNAMIC HTML PER MENU. | |
| 20 | MENU POS | UCView | UCView MENU POS MENU POS INTEGRATION PER MENU. | |
| 57 | PM-SAFETY-6DOWN | Adaptive Technologies | Adaptive Technologies PM-SAFETY-6DOWN Safety Cable Anchor Point. | |
| 18 | UNDIO2X2+ | Attero Tech | Attero Tech UNDIO2X2+ DANTE NETWORKED AUDIO INTERFACE - 2X2 MIC/LINE I/O. POE OR 24VDC. | |
| 1 | R9861512US | Barco | Barco R9861512US CL.CKSHARE CX-20 WIRELESS CONFERENCING SYSTEM, INCLUDES (1) CONFERENCING BUTTON. | |
| 2 | 28102 | C2G | C2G 28102 2M USB 2.0 A/B CABLE - BLACK (6.4 FT) | |
| 34 | 39942 | C2G | C2G 39942 3.5MM TO TWO RCA M-M STEREO AUDIO CABLE, 3 FT. | |
| 1 | 40423 | C2G | C2G 40423 3.5MM TO TWO RCA M-M STEREO AUDIO CABLE, 6 FT. | |
| 30 | 40601 | C2G | C2G 40601 3ft Velocitya 3.5mm M/M Stereo Audio Cable | |
| 47 | MTM1U | Chief | Chief MTM1U Medium Fusion Micro-Adjustable Tilt Wall Mount. | |
| 24 | ODMLA25 | Chief | Chief ODMLA25 ODM LFP UNIV SWING ARM MOUNT - Black | |
| 1 | VCTUW | Chief | Chief VCTUW XL UNIVERSAL PROJECTOR MOUNT - WHITE | |
| 1 | XTM1U | Chief | Chief XTM1U EXTRA LARGE FUSION MICRO-ADJUSTABLE TILT FLAT PANEL MOUNT UNIVERSAL. | |
| 1 | C3COM-3 | Crestron | Crestron C3COM-3 RS-232 3-PORTINTERFACE CARD FOR 3-SERIES CONTROL SYSTEMS | 2107JBH28717 |
| 4 | CEN-IO-COM-102 | Crestron | Crestron CEN-IO-COM-102 WIRED ETHERNET MODULE WITH 2 COM PORTS | |
| 1 | CEN-SWPOE-16 | Crestron | Crestron CEN-SWPOE-16 16 PORT MANAGED POE SWITCH | 2138NEJ02999 |

| | | | | |
|---|---|---|---|---|
| 10 | QUATTROCANALI 4804 DSP+DANTE | Powersoft | Powersoft QUATTROCANALI 4804 DSP+DANTE 4-CHANNEL 4800W FLEXIBLE AMPLIFIER WITH DSP AND DANTE. | 776763, 776762, 776764, 776765, 776766, 776742, 776746, 776760, 776740, 776745 |
| 5 | CORE 110F | QSC | QSC CORE 110F UNIFIED SERIES CORE WITH 24 LOCAL I/O CHANNELS, 128X128 NETWORK I/O CHANNELS, DUAL LAN PORTS, TELEPHONE POTS, 16X16 GPIO, 1 AEC CHANNELS, 1RU | N43218GJ4, N43218GK3, N43218GK7, N43218GHL N43218GHH |
| 2 | PS-1600G | QSC | QSC PS-1600G Q-SYS 4-BUTTON PAGING STATION WITH GOOSENECK MICROPHONE. | 12US2146201517, 12US2147202074 |
| 5 | SL-DAN-32-P | QSC | QSC SL-DAN-32-P Q-SYS SOFTWARE-BASED DANTE 32X32 CHANNEL LICENSE, PERPETUAL. | |
| 4 | SL-QSE-110-P | QSC | QSC SL-QSE-110-P Q-SYS CORE 110 SCRIPTING ENGINE SOFTWARE LICENSE PERPETUAL | |
| 4 | SL-QUD-110-P | QSC | QSC SL-QUD-110-P UCI LICENSE | |
| 19 | EZ-RA6 | RDL | RDL EZ-RA6 RACK ADAPTER FOR UP TO 6 UNITS OF 1/6 RACK WIDTH. | |
| 4 | UA505 | Shure | Shure UA505 REMOTE ANTENNA MOUNTING BRACKET KIT | |
| 2 | ULXD2/SM58-H50 | Shure | Shure ULXD2/SM58-H50 WIRELESS HAND HELD TRANSMITTER WITH SM58 MICROPHONE COMPATIBLE WITH ULX-D D | |
| 2 | ULXD4D-H50 | Shure | Shure ULXD4D-H50 DUAL CHANNEL DIGITAL WIRELESS RECEIVER WITH INTERNAL POWER SUPPLY, 1/2 WAVE | |
| 2 | WL183 | Shure | Shure WL183 MICROFLEX OMNIDIRECTIONAL CONDENSER LAVALIER MICROPHONE. | |
| 1 | FW-85BZ40H | Sony | Sony FW-85BZ40H 85-INCH 4K UHD LED DISPLAY WITH 4 HDMI & 1 COMPOSITE VIDEO INPUT. DIGITAL OPTICAL AND ANALOG AUDIO OUTPUTS. 2 USB PORTS. RS-232 CONTROLLABLE. | S014501358C |
| 1 | ACCESS LICENSE | UCView | UCView ACCESS LICENSE (Qty 237) PLAYER ACCESS LICENSE FOR VIEWEDGE DIGITAL SIGNAGE SERVER | |
| 1 | PowerEdge R540 | Dell | Dell PowerEdge R540 (1) Intel Xeon Gold 5218 CPU MOTHERBOARD, V2, 3 5 CHASSIS WITH UP TO 8 HOT PLUG HARD DRIVES, INTERNAL PERC, HT (125W) DDR4-2666, PERFORMANCE OPTIMIZED, RAID 10 SERVER. | |

| 23 | JUMPSTART HOURLY CONFIGURATION | UCView | UCView JUMPSTART HOURLY CONFIGURATION Installation: Configuration |
| 37 | JUMPSTART HOURLY CONFIGURATION | UCView | UCView JUMPSTART HOURLY CONFIGURATION Configuration and Programming of UCVIEW Software |
| 20 | CST-1600-10 | Fair-Play | Fair-Play CST-1600-10 Court Side Table, 10' with BB-1600-4 Face and Functionality, no control included |
| 20 | 33-0000-08 | Fair-Play | Fair-Play 33-0000-08 KIT-SIDE PAD SET LONG 37 3/4 |
| 20 | DCI-80/60 | Fair-Play | Fair-Play DCI-80/60 MP-80/60 DOUBLE CABLE INTERFACE |

*{00060117.DOCX 1}*
Legacy
Landlord Waiver (Stonebriar)
INSIGHT LEGAL CLEAN; 04/22/22

**417**

**App'x 6**

**July 25 Letter**

July 25, 2022

Ron Linn
Stonebriar Commercial Finance LLC
5601 Granite Parkway, Suite 1350
Plano, TX 75024

> RE: Lessee: Legacy Sports USA, LLC Equipment Schedule No. 2 to Master Lease Agreement No. 9586 dated September 13, 2021 (collectively the "Equipment Lease Agreement").

Ladies and Gentlemen:

Insight Investments, LLC ("Insight") indemnifies and holds Stonebriar Commercial Finance LLC harmless from Insight's inability to provide Stonebriar Commercial Finance LLC with the Landlord Waiver for the above-referenced transaction.

The consideration for this indemnification is the loan that Stonebriar Commercial Finance LLC will make to Insight evidenced by a Promissory Note dated July 27, 2022. This Promissory Note is secured by the collateral described in the Security Agreement dated July 27, 2022.

If the original documentation is not delivered to Stonebriar Commercial Finance LLC's office, then Insight, at Stonebriar Commercial Finance LLC's sole discretion, shall repurchase the Equipment Lease Agreement for the principal outstanding of the Promissory Note, plus accrued interest at the rate stated in the Promissory Note, plus all costs of collection including attorney's fees.

Sincerely,
Insight Investments, LLC

Signature: _____

Printed Name: Christopher M. Czaja

Title: President

Date: 7/25/22

**269**

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Mandy Gonzales on behalf of Thomas Wright
Bar No. 22059400
gonzales@wrightclosebarger.com
Envelope ID: 98221629
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Appellant's Brief
Status as of 3/10/2025 7:09 AM CST

Associated Case Party: Stonebriar Commercial Finance, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Rachel H.Stinson | | stinson@wrightclosebarger.com | 3/7/2025 4:28:43 PM | SENT |
| Thomas C.Wright | | wright@wrightclosebarger.com | 3/7/2025 4:28:43 PM | SENT |
| Kyle Steingreaber | | steingreaber@wrightclosebarger.com | 3/7/2025 4:28:43 PM | SENT |

Associated Case Party: Insight Investments, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| LeElle Slifer | 24074549 | lslifer@winston.com | 3/7/2025 4:28:43 PM | SENT |
| Dylan French | | dfrench@winston.com | 3/7/2025 4:28:43 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Houston Docketing | | ecf_houston@winston.com | 3/7/2025 4:28:43 PM | SENT |
| Newman Nahas | | NNahas@winston.com | 3/7/2025 4:28:43 PM | SENT |